WILLIAM H. SCHWANKE, INC., Respondent, vs. WISCONSIN TELEPHONE COMPANY and another, Appellants.

*September 13—October 8, 1929.*

For the appellants there was a brief by *Miller, Mack & Fairchild,* attorneys for the Wisconsin Telephone Company, and *Nohl, Nohl, Petrie & Blume,* attorneys for the Cuneo Printing Corporation, and oral argument by *Paul R. Newcomb,* all of Milwaukee.

*Walter D. Corrigan, Sr.* of Milwaukee, for the respondent.

OWEN, J. The plaintiff is the proprietor of a retail jewelry store in Milwaukee. For a number of years it has been a subscriber to the telephone service of the defendant Wisconsin Telephone Company. The number assigned to it was "Broadway 8770." The telephone directory issued by the telephone company in November, 1926, while indicating that to be plaintiff's number, also assigned it as the number of Thrift Builders, Inc. This was due to a mistake in the printing of the directory. Thereafter plaintiff was annoyed by telephone calls intended for Thrift Builders. The telephone company attempted to remedy the difficulty by blocking No. 8770. Upon a call coming in for that number, the receiving operator would inquire whether the caller desired Thrift Builders or the plaintiff. If the plaintiff was wanted

the caller would be instructed to "hang up" and call "Broadway 8770X." This was usual practice in such cases.

The evidence discloses, however, that this measure did not remedy the difficulty. The plaintiff continued to be annoyed by calls intended for Thrift Builders. Outsiders still had difficulty in securing the plaintiff's store. By reason of this, plaintiff claims that its business was greatly damaged during the months of December, 1926, and January, 1927. The jury awarded plaintiff $600 for this item of damages.

The following table indicates plaintiff's gross sales for the four years, 1924–27, both inclusive:

|  | 1924. | 1925. | 1926. | 1927. |
|---|---|---|---|---|
| January | $3,122 49 | $3,990 86 | $7,358 25 | $2,969 12 |
| February | 4,098 57 | 4,064 98 | 4,781 52 | 5,391 62 |
| March | 3,793 14 | 3,383 13 | 4,121 15 | 4,229 91 |
| April | 4,268 50 | 5,633 79 | 4,271 12 | 6,658 75 |
| May | 4,358 99 | 3,598 79 | 4,168 19 | 5,254 50 |
| June | 6,861 68 | 5,610 43 | 8,251 23 | 6,491 89 |
| July | 4,621 13 | 7,227 05 | 6,745 12 | 6,205 61 |
| August | 3,531 14 | 3,965 71 | 4,742 24 | 6,187 57 |
| September | 5,211 21 | 6,379 76 | 7,367 81 | 4,862 51 |
| October | 5,618 05 | 5,741 85 | 5,890 87 | 4,688 91 |
| November | 6,668 97 | 4,618 94 | 5,958 53 | 6,397 30 |
| December | 22,827 16 | 25,049 85 | 22,698 08 | 25,001 02 |
|  | $74,981 03 | $79,265 14 | $86,354 11 | $84,138 71 |

This indicates a falling off of sales during the months of December and January as compared with the preceding year. But we are unable to find any evidence that this falling off in sales is attributable in any degree to the unsatisfactory telephone service. A study of this table conclusively shows a variation in the amount of sales for any month compared with the same month for other years. For instance, the amount of sales for December, 1926, was about ninety per cent. of the sales for December, 1925, and December, 1927. The sales for January, 1927, were only about forty per cent. of the sales for January, 1926, and about seventy-five per

cent. of those for January, 1925, while they are about the same as those for January, 1924. The sales for June, 1927, were less than eighty per cent. of those for June, 1926. Likewise the sales for August, 1926, are less than eighty per cent. of the sales for August, 1927, while the sales for September, 1927, were less than seventy per cent. of the sales for 1926. Many other similar comparisons may be made, but the foregoing is sufficient to indicate what may be taken to be common knowledge that there are ordinarily fluctuations in business such as plaintiff's when the sales for any month are compared with those of the same month for other years. That it is unsound to conclude that plaintiff's loss of sales is attributable to unsatisfactory telephone service vividly appears when it is noted that its sales in December, 1926, were but ten per cent. less than those of the immediately preceding and immediately following December, based upon sales aggregating $25,000, while in January they were sixty per cent. less, based upon sales of $7,300 in 1926. If plaintiff's loss of business in December and January is attributable to telephone service, why should the falling off be but ten per cent. in December and sixty per cent. in January? This evidence goes no further than to indicate that there was a falling off of sales in December and January, during which time he had unsatisfactory telephone service. But it is incumbent upon the plaintiff to establish that the falling off in sales was attributable to the unsatisfactory telephone service.

The evidence tending to establish that plaintiff's sales were promoted by telephone service is the most meager and unsatisfactory. It may be conceded that the service was a convenience if not a necessity in the general prosecution of plaintiff's business. But it must appear in addition to that, to entitle the plaintiff to recover, that the telephone service contributed to the promotion of its sales. Mr. Schwanke, the president of the corporation and principal owner of the

business, testified generally that the telephone was of use in making sales; that it was of considerable use especially at that time of the year. More specifically, however, he testified that the uses made of the telephone in promoting sales were the following: whenever at any time during the year a customer indicates a liking for a certain piece of jewelry, a notation is made of that in the store, and, as the holiday season approaches, the wife or husband or some friend is called, and they are reminded of such desire expressed by the customer, with the thought that it may result in a Christmas gift and a sale. However, this use relates to outgoing messages, and there is no contention in this case that plaintiff had difficulty in securing connection with parties called by it.

The plaintiff also made the following general statement: "We certainly get calls right along, especially by salesmen, say for a Virginia Carval pattern No. 7186. Patterns have a definite name and number and we get an order of some certain pattern." There is no evidence, however, to indicate how sales such as these compare with the total sales of the plaintiff, nor is there any testimony that any such sales were in fact lost. The record is entirely barren of any testimony to the effect that plaintiff lost any sales because of unsatisfactory telephone service. The nearest approach to such testimony is that of the plaintiff, who testified that he tried to get his store one morning to tell the employees where to find a certain diamond which a customer was coming in to examine. He says: "I called the store in the morning approximately at 8:15. No answer. I was shaving and I called again about 8:30. When I got through with breakfast I went because the customer was due at 9 o'clock. I could not get any answer from the store. He happened to be a customer that was looking for a marquise diamond, price $1,950. He came in and Mr. Wirth didn't know the details of it and wasn't able to give it to him and we lost the sale." He also testifies that on another occasion he was in an insurance

office in the Wells Building. A customer wanted to buy a diamond ring for his wife. Schwanke had two rings with him which he showed the customer. The customer asked to see a few more styles. Schwanke called the store and could not get it. He "hung up" and tried again and could not get it. He made a personal trip to the store for the other rings, but upon his return the customer was not there.

Certainly these experiences were not due to the mistake in the telephone directory. Schwanke knew the number of his store. He knew that in order to reach his store it was necessary for him to call "Broadway 8770X." If he did not reach his store, it is probable that he did not have patience to wait until the phone was answered, as, according to his testimony, telephone calls coming to the store were not answered for periods varying from one to five minutes. The entire testimony may be epitomized as follows: outsiders did have difficulty in reaching the store. This was due to some extent to the error in the telephone directory. It was also due to some extent to the customary, prolonged delay in answering telephone calls at the store. The volume of plaintiff's sales did not depend upon outsiders securing telephone connection with the store. The record is barren of any evidence to indicate the loss of a single sale by reason of the error in the telephone book. The evidence furnishes no justification for a conclusion that plaintiff's sales were diminished by reason of such error. The amount awarded for this item of damages cannot stand.

Much reliance is placed by the plaintiff upon the case of *Trester & Trester, Inc. v. Kahn,* 189 Wis. 60, 205 N. W. 826. In that case the approach to plaintiff's store was unlawfully obstructed by the defendant. He proved the loss of sales. In that case it appeared that the loss of sales could be reasonably attributed in some degree to the unlawful obstruction, and a verdict in favor of the plaintiff was permitted to stand. The doctrine of that case would be applicable here

did it appear that the error in the telephone book was responsible for a loss of sales, but, lacking that element, there is no similarity between the two cases. However, the plaintiff's testimony establishes the fact that much time on the part of his employees was consumed in answering calls for Thrift Builders. For this element of damages the jury awarded plaintiff $40. This finds support in the evidence and the judgment for this amount is sustained.

Counsel for appellant questions the liability of the telephone company for damages resulting from its mistake in assigning plaintiff's number to Thrift Builders. A telephone directory is an indispensable element of telephone service. Without such a directory the presence of a telephone in a place of business is of negligible value. When a telephone company contracts to furnish telephone service it impliedly agrees to place the subscriber's name and the telephone number in its directory when that directory is issued in due course of business. Its failure to do so constitutes a breach of contract, and it is plainly liable upon general principles for damages resulting from such breach.

*By the Court.*—The judgment is modified so as to award the plaintiff $40 instead of $640, and, as so modified, is affirmed. Appellant to recover costs.

CROWNHART, J. (*dissenting in part*). The court sets aside the verdict of the jury for damages to plaintiff's business, on the ground of insufficiency of proof. From the nature of the case, definite and accurate proof could not be made. The best proof of which the case was susceptible was made. I take it no one will deny that where a telephone, serving a business establishment, is put out of service, some damage is bound to result.

In *Sommerville v. Chesapeake & Potomac Tel. Co.* 258 Fed. 147, 149, the court said: "To prove that one lost a certain number of dollars by reason of the company's action

might be very difficult, and yet, we think, all reasonable men would say that he was injured thereby."

The only purpose of subscribing to the service in such a place is that the service aids the business. If so, we must concede that the plaintiff in this case was damaged by failure of the service, and the only question remains as to the amount of the damages. I think the evidence sufficient to make the amount of damages a question for the jury. Evidence of plaintiff's gross sales for the same period for the years 1924, 1925, 1926, and 1927 was produced. This showed larger sales for each of the years during the same period of time, when the service was not interrupted, than for the year when it was so interrupted. The evidence also showed that there was no other sufficient reason for the decrease of sales during the period of failure of service, except from such failure. The only explanation the court makes to escape this conclusion is that in other months of the same years there were greater variations in sales. That is true; but these periods were not in issue, and, if they were, probably some sufficient reason for such variations might have been made. Certainly there was a reason. Having shown damage, the amount was for the jury in the first instance.

If the trial court or this court should determine that the verdict was too high, the amount should be modified, not set aside altogether. There are many cases where the jury are allowed to assess damages without more accurate evidence. Take damages for pain and suffering in personal injury cases, or mental anguish, or damages to reputation in slander or libel,—in such cases there can be no definite evidence of damages. That is left to the jury to infer from all the circumstances.

In *Allison v. Chandler*, 11 Mich. 542, 555, the court said:

"The law does not require impossibilities; and cannot therefore require a higher degree of certainty than the nature of the case admits."

In the *Allison Case, supra,* the court further said:

"But shall the injured party in an action of tort, which may happen to furnish no element of certainty, be allowed to recover no damages (or merely nominal), because he cannot show the exact amount with certainty, though he is ready to show, to the satisfaction of the jury, that he has suffered large damages by the injury? Certainty, it is true, would thus be attained; but it would be the certainty of injustice."

I can see no reasonable distinction between this case and *Trester & Trester, Inc. v. Kahn,* 189 Wis. 60, 205 N. W. 826. In fact, the proof as to damages seems to be as satisfactory in the instant case as in the *Trester Case.* In that case we said, quoting from former decisions of this court: "Cases are not dismissed nor are judgments reversed merely because of difficulty in fixing accurately the amount of the damages."

I think the verdict of the jury in this case is sufficiently sustained by competent evidence. I therefore respectfully dissent.

I am authorized to state that Mr. Justice FRITZ joins in this dissent.