DISCOUNT FABRIC HOUSE OF RACINE, INC.,
Plaintiff-Respondent-Petitioner,

v.

WISCONSIN TELEPHONE COMPANY, a Wisconsin
corporation, Defendant-Appellant.

Supreme Court

*No. 82–350. Argued February 27, 1984.—Decided March 27, 1984.*

(Also reported in 345 N.W.2d 417.)

For the plaintiff-respondent-petitioner there were briefs by *Russell M. Ware* and *Schoone, McManus, Hankel, Ware & Fortune, S.C.*, Racine, and oral argument by *Russell M. Ware.*

For the defendant-appellant there was a brief by *F.D. Huber, Jr.*, Milwaukee, and oral argument by *Mr. Huber.*

STEINMETZ, J. The issue in the case is whether the relief from liability provision in the Wisconsin Telephone Company's yellow pages advertising contract is unconscionable and unenforceable as against the public policy of this state.

Edward C. Flatten and his wife, Oryne, have operated a drapery and fabric business in Racine since 1968. They incorporated in 1974 as Discount Fabric House of Racine, Inc. and in 1976 started doing business as The Inside Look, a division of Discount Fabric House of Racine, Inc. They had been listed yearly in the Racine yellow pages and regularly had one display advertisement in that directory.

After carrying the quarter-page advertising display in the yellow pages correctly for three years, in 1978 the telephone company omitted the plaintiff's long-standing trade name "Discount Fabric House" from the display ad. Discount Fabric House commenced this action to recover damages for business losses resulting from the telephone company's error in the directory.

The telephone company raised as a defense the following clause from the advertising contract between Discount Fabric House and itself:

"4. Applicant agrees that the Telephone Company shall not be liable for errors or omissions (including total omissions) in directory advertising beyond the applicable charges for the item or items in which errors or omissions occur for the issue life of the directory involved."

The advertising contract between the telephone company and Discount Fabric House is a form contract that the telephone company uses for all of its yellow pages advertising sales. Mr. Flatten had signed similar contracts for advertising in previous years and there was no fraud or mistake pleaded or raised at trial. The parties stipulated that all yellow pages advertising in Wisconsin for the year in question utilized the same form contract. Furthermore, none of the telephone company's employees or agents had the authority to alter any of the terms or provisions of the standard contract, nor had they ever done so. The parties also stipulated that there was never

any bargaining on either price or terms with any advertiser; each subscriber in the Racine directory paid exactly the same for the same size listing or advertisement.

The jury determined that Discount Fabric House sustained $9,000 in business damages as a result of the omission of its trade name from its display advertisement. The Racine county circuit court, Honorable John C. Ahlgrimm, then ruled that the clause limiting liability was unconscionable and against public policy and granted judgment on the verdict.

The court of appeals certified the case to this court, which was denied. Thereafter, the court of appeals reversed the judgment of the trial court in *Discount Fabric House v. Wisconsin Tel.,* 113 Wis. 2d 258, 334 N.W.2d 922 (Ct. App. 1983).

The telephone company labels this contract clause as a limited liability provision obviously to avoid the selective view courts give to exculpatory contracts. To the contrary, we find that this is an exculpatory contract. The Random House Dictionary of the English Language (Unabridged Edition 1966) defines "exculpatory" as "tending to clear from a charge of fault or guilt." When performing a negligent business act as here, the telephone company is not cleared of fault by the contract clause but rather is relieved of liability for that fault. To say that the clause is limiting rather than exculpatory because the clause considers a return of part or all of the applicable charges for the advertisement, does not consider the complete elimination of all resulting financial injuries caused by the negligent act. For the telephone company to return the charges, which were not earned due to its negligent breach of the contract, does not consider the resulting injury to the customer caused by its negligent or tortious act in not publishing the advertisement for which the customer had contracted. This is not

a limiting clause but a clause that made the contract an exculpatory one in its nature.

We defined exculpatory contracts in *Merten v. Nathan*, 108 Wis.2d 205, 210, 321 N.W.2d 173 (1982) as follows: "contracts which relieve a party from liability for harm caused by his or her own negligence." Returning the contract price or a portion of it not earned does not relieve this clause from being exculpatory since it protects the telephone company against damages for its negligent act. Returning charges for the ad not earned due to negligence is not the same as paying damages for the mistake made.

A clearer example of a take-it-or-leave-it transaction is hard to imagine. The only way Discount Fabric House could purchase a display ad in the yellow pages was to sign a standard form contract provided by the telephone company. Although there are "yellow pages" published by independent publishers, the telephone company's yellow pages is the only one distributed to everyone with a telephone.

There is nothing in this record to show that the telephone company has filed a "tariff limitation" of liability for errors in its directory listings with the Wisconsin Public Service Commission. Such claim arises for the first time in the telephone company's brief in which it is admitted that such liability restricting filing was neither pleaded nor proved because the display ad involved was a matter of private contract. Yet, in the brief we are asked to consider that the tariff limitation does exist by taking judicial notice of administrative rules. We refuse to take such notice. In the record there is no approval by the commission of the exculpatory clause in this private contract executed by the telephone company for an ad in its yellow pages. The argument was not made in either the trial court or the court of appeals. We will not con-

sider factual matters raised for the first time on appeal. *Wirth v. Ehly,* 93 Wis. 2d 433, 444, 287 N.W.2d 140 (1980).

The courts have historically treated yellow page advertising as outside a utility's public service offering. It generally has been construed as a matter of private contract under which the parties may validly limit their liability.[1]

The courts cited in footnote 1 have treated the restrictive clause as one limiting liability for errors or omissions. We refuse to adopt that holding and hold instead that the clause and surrounding circumstances between the parties made it an exculpatory contract. As we explained in *Merten,* 108 Wis. 2d at 212:

[1] *Wade v. Southwestern Bell Telephone Company,* 352 S.W.2d 460 (Tex. Civ App. 1961); *Baird v. C & P. Tel. Co. of Baltimore,* 208 Md. 245, 117 A.2d 873 (1955); *Pride v. Southern Bell Tel. & Tel. Co.,* 244 S.C. 615, 138 S.E.2d 155 (1964); *Advance Service, Inc. v. General Telephone Co. of Fla.,* 187 So. 2d 660 (Fla. Dist. Ct. App. 1966); *Wilson v. Southern Bell Telephone & Telegraph Co.,* 194 So. 2d 739 (La. App. 1967); *Wheeler Stuckey, Inc. v. Southwestern Bell Telephone Co.,* 279 F. Supp. 712 (W.D. Ok. 1967); *Warner v. Southwestern Bell Telephone Co.,* 428 S.W.2d 596 (Mo. 1968); *Mt. States Tel. and Tel. Co. v. District Court,* 160 Mont. 443, 503 P.2d 526 (1972); *Robinson Ins. & Real Est. Inc. v. Southwestern Bell Tel. Co.,* 366 F. Supp. 307 (WD Ark. 1973); *Wille v. Southwestern Bell Tel. Co.,* 219 Kan. 755, 549 P.2d 903 (1976); *University Hills Beauty Academy v. Mt'n States T & T,* 38 Colo. App. 194, 554 P.2d 723 (1976); *Mendel v. Mountain States Tel. & Tel. Co.,* 117 Ariz. 491, 573 P2d 891 (1977); *Louisville Bear Safety v. South Cent. Bell Tel.,* 571 S.W.2d 438 (Ky. Ct. App. 1978); *Berjian v. Telephone Co.,* 54 Ohio St. 2d 147, 375 N.E.2d 410 (1978); *Woodburn v. Northwestern Bell Tel. Co.,* 275 N.W.2d 403 (Iowa 1979); *Affiliated Professional v. South Central Bell,* 606 S.W.2d 671 (Tenn. 1980); *McClure Eng'r v. Reuben Donnelley Corp.,* 101 Ill. App. 3d 1109, 428 N.E.2d 1151 (1981); *Roll-Up Shutters v. South Cent. Bell Tel.,* 394 So. 2d 796 (La. App. 1981); *Tobler's Flowers v. Southwestern Bell Tel.,* 632 SW2d 15 (Mo. App. 1982).

"Adherence to principles of contract law would generally lead a court to enforce an exculpatory agreement without passing on the substance of the agreement. Adherence to principles of tort law would tend to make a court reluctant to allow parties to shift by contract the burden of negligent conduct from the actor to the victim who has no actual control or responsibility for the conduct causing the injury. The rules governing exculpatory contracts reflect the uneasy balance between these principles of contract and tort law." (Footnote omitted.)

There are four situations in which exculpatory contracts have been declared void on public policy grounds. (1) A contract arises out of a business generally thought suitable for public regulation; (2) the party seeking exculpation is engaged in performing a service of great importance to the public; (3) the party seeking exculpation holds itself out as willing to give reasonable public service to all who apply; and (4) the party invoking exculpation possesses a decisive advantage of bargaining strength.

This conduct arises out of a private business transaction of the telephone company which in all other respects has been recognized as a monopoly and has been regulated by the Public Service Commission in performing its services. Certainly, the telephone company would not argue that it is engaged in a business other than one which performs a service of great importance to the public when it distributes a yellow pages book without cost to every telephone customer. The telephone company without question holds itself out as willing to give reasonable public service to all who apply for an advertisement in the yellow pages.

As to whether the telephone company, which is invoking exculpation, possesses a decisive advantage of bargaining strength, the courts have differed. Some courts

hold there are many other modes of advertising which the businessman may employ if the contract offered him by the telephone company is not attractive. *Wille v. Southwestern Bell Telephone Co.,* 219 Kan. 755, 549 P.2d 903, 910 (1976); *also Classified Directory Subscribers Ass'n. v. Public Serv. Com'n,* 383 F.2d 510, 513 (D.C. Cir. 1967). The issue is not whether there are other modes of advertising available but whether such other modes are tied directly to the telephone service enjoyed by almost every home and business in the Racine area. Does any other mode of advertising reach every office or home where there is a telephone installed at no identifiable cost to the consumer or advertiser for distribution but only for the space of the ad in the yellow pages which is at a recognized reasonable and equal charge for all ad takers? The telephone company has wisely and responsibly taken advantage of an energy conserving society, both as to time and natural resources, by advertising that persons should determine the availability of products before traveling to shopping areas by letting their fingers do the walking through the yellow pages. The telephone company has an exclusive private advertising business which, if not legally monopolistic, is tied to its public utility service of providing telephone service. Without additional or identifiable charges, every telephone customer receives the yellow pages free with the telephone service. There is nothing in this record to show that there is any other mode of advertising available to Discount Fabric House which reaches as many customers, is of a similar nature as the yellow pages, and is inexorably tied to the telephone service.

Therefore, when the telephone company states to a customer that the ad will be carried but on its terms, and if negligently done the telephone company may not be held for damages, there is definitely a decisive advantage of bargaining strength possessed by the telephone com-

pany. It is a greater disparity in the bargaining power of the contracting parties than may be found generally to exist. The restraining influence on the telephone company's advertising prices due to the availability of other non-similar advertising is not known, but the non-bargaining, non-responsibility clause as to damages certainly shows that there has not been any effective influence due to competitors for the advertising dollar.

The Restatement (Second) of Contracts sets forth the following situations in which exculpatory contracts are unenforceable on grounds of public policy:

" '(1) A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.

" '(2) A term exempting a party from tort liability for harm caused negligently is unenforceable on grounds of public policy if

" '(a) the term exempts an employer from liability to an employee for injury in the course of his employment;

" '(b) the term exempts one charged with a duty of public service from liability to one to whom that duty is owed for compensation for breach of that duty, or

" '(c) the other party is similarly a member of a class protected against the class to which the first party belongs.

" '(3) A term exempting a seller of a product from his special tort liability for physical harm to a user or consumer is unenforceable on grounds of public policy unless the term is fairly bargained for and is consistent with the policy underlying that liability.' Sec. 195, Restatement (Second) of Contracts (1979).

". . . These categories, however, are not intended as an exhaustive list of situations in which exculpatory contracts are unenforceable on the grounds of public policy. Comments *a* and *b*, sec. 195, Restatement (Second) of Contracts, p. 66 (1979). Public policy is a broad, not easily defined concept. It embodies the community common sense and common conscience. Public policy is 'that principle of law under which freedom of contract or private dealings is restricted by law for the good of the

community.' *Higgins v. McFarland,* 196 Va 889, 86 SE2d 168, 172 (1955)." *Merten,* 108 Wis. 2d at 212–13.

The contract between the parties arises from a business subjected to public regulation except for the particular act contracted for, *i.e.,* commercial advertising in the yellow pages. The telephone company seeks exculpation in assembling and publishing the yellow pages. In publishing the yellow pages the telephone company is engaged in performing a service of great, if not essential, importance to the public and it holds itself out as willing to give *reasonable* public service to all who apply to place ads in the yellow pages. The telephone company possesses a decisive advantage of bargaining strength.

Some courts have held exculpatory clauses, as in this contract, not unconscionable since allowing damages for the telephone company's negligent acts in publishing the yellow pages would be delving in speculation. In *Wille v. Southwestern Bell Telephone Co.,* 219 Kan. 755, 763, 549 P.2d 903, 910, that court stated, citing *Gas House, Inc. v. Southern Bell Tel. & Tel. Co.,* 289 N.C. 175, 221 S.E.2d 499 (1976):

" 'It would be virtually, if not completely, impossible to determine what portion of the business done by an advertiser is attributable to its use of 'Yellow Page' advertising. There are many factors which enter into periodic fluctuations in the volume of business done by a seller of goods. The purpose of the Limitation of Liability Clause is to protect the telephone company from the danger of verdicts primarily speculative in amount. This is not an unreasonable objective.' "

*See also Wade v. Southwestern Bell Telephone Company,* 352 S.W.2d 460, 462 (Tex. Civ. App. 1961). This same language is relied on in *Mendel v. Mountain States Tel. & Tel. Co.,* 117 Ariz. 491, 494, 573 P.2d 891, 893 (1977).

Although the telephone company's objective is valid, it is the effect of the clause in violating public policy that

is relevant. The jury in the instant case was able to con-sider Discount Fabric House's evidence and accept its persuasive quality in awarding a $9,000 verdict for dam-ages sustained. The evidence was not speculative nor so thin as to be prejudicial against the telephone company since the verdict passed the scrutiny of an experienced trial judge on motions after verdict. Sec. 805.16, Stats.[2]

The telephone company's position on appeal relies ex-clusively on the exculpatory clause as to its effect and validity. We believe that the speculation argument is not valid in Wisconsin since we protect against speculative damages by the jury system, instructions given to the jury, trial judges' rulings during the trial and motions after verdict. Denying a party the right to legitimate and provable damages must be granted only in rare cir-cumstances or the public policy of this state would be offended. *See* Art. I, sec. 9, Wisconsin Constitution.[3] If

---

[2] Sec. 805.16, Stats., provides as follows:

"**805.16 Time for motions after verdict.** Upon rendition of ver-dict, the judge shall in open court set dates for serving and filing motions and briefs and for arguing motions. No notice of motion need be served for motions after verdict. The dates for hearing arguments on motions shall be not less than 10 nor more than 60 days after verdict. If an order granting or denying a motion chal-lenging the sufficiency of evidence or for a new trial is not entered within 90 days after verdict, the motion shall be deemed denied. Notwithstanding the foregoing, a motion for a new trial based on newly discovered evidence may be made at any time within one year after verdict. Unless an order granting or denying the motion is entered within 30 days after hearing, the motion shall be deemed denied."

[3] Art. I, sec. 9 of the Wisconsin Constitution provides:

"**Remedy for wrongs.** SECTION 9. Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, con-formably to the laws."

the clause is found contrary to public policy and therefore unenforceable, this does not make the telephone company an insurer against consequential damages of its solicited advertisers; the telephone company would only be held liable to its subscribers for damages caused by its own negligent acts.[4] That determination does not make the telephone company's position in the business world any different than the vast majority of other commercial enterprises.

The telephone company argues for the efficacy of the clause in that not being held economically responsible for its negligent acts in publishing the yellow pages keeps down the rate it charges ad subscribers. That would be an attribute of cost thrift acceptable to all commercial enterprises. In this argument there is an implied threat of advertising rates going up if the telephone company is subject to being held financially responsible for its negligent acts of publication. This was recognized as a valid consideration in *Berjian v. Telephone Co.*, 54 Ohio St. 2d 147, 157, 375 N.E.2d 410, 416 (1978) by stating: "Burdened with unpredictable and indeterminable future liabilities, telephone companies more than likely would be disinclined to provide the convenient service at all, or would provide the service at a prohibitive cost." The reasoning for the statement was that the company has no opportunity to correct the error until the next publication of alphabetical listing, thus depriving the company of the opportunity of mitigating the damages caused to its customers. We reject the threatened consequences theory as a criteria for deciding issues. As we stated in *Arnold v. Shawano County Agr. Society*, 111 Wis. 2d 203, 213, 330 N.W.2d 773 (1983) :

"The defendant maintains that if this exculpatory contract is not enforced, promoters will no longer be willing

---

[4] *See University Hills Beauty Academy v. Mt'n States T & T*, 38 Colo. App. 194, 554 P.2d 723, 726 (1976).

to sponsor automobile racing. We will not decide issues on the basis of threatened consequences. The worth of racing is for the public to decide. We are a sophisticated, modern society where insurance can be used to spread risks. In addition, ticket prices can be adjusted to cover the risks of the entertainment. Events will not go unsponsored so long as the public demands and values that event."

This analysis is equally applicable to the advertising rates of the yellow pages. As long as such advertising has value, as it obviously does, there will be those in the public who will subscribe for it. The costs of the ads are only one factor in their attractive value to the public subscribers.

During oral argument, the telephone company admitted to a negligent error factor of one or two in 1,000 ads in the yellow pages which is .001 or .002,[5] a noteworthy accomplishment which would be difficult to improve.[6] The other 998 to 999 out of 1,000 ad subscribers will not be greatly offended economically if the risk is spread so that the one or two out of 1,000 who are damaged due to the company's errors or omissions are not forced, due to the exculpatory clause, to bear their losses without recompense. Also, during oral argument a statement was made by the telephone company attorney that the telephone company carries insurance of $85 million over the basic $1½ million coverage. This exculpatory clause may have kept the company's insurance premiums down or may have been a bonus for its carrier, but if there is any effect on the rate for the ads, its direct effect in a true case of damages due to the company's neglect will not be

---

[5] In *Southern Bell Tel. & Tel. Co. v. C & S Rlty.*, 141 Ga. App. 216, 233 S.E.2d 9, 12 (1977) the record was that "[o]ut of some 345,000 Yellow Page entries processed, there was an overall error rate of one half of one percent."

[6] In order to assure greater accuracy, the telephone company could present a final print-out of the ad to the customer for approval.

an earth-shattering experience but rather one that is diluted many times.

"[S]ince [exculpatory clauses] exempt parties from liability that would otherwise attach, the law does not favor them. Courts closely scrutinize such agreements and construe them strictly against the party seeking to rely on them. *Merten v. Nathan,* 108 Wis. 2d 205, 211, 321 N.W.2d 173 (1982)." *Arnold,* 111 Wis. 2d at 209.

"Since such provisions tend to induce a want of care, they are not favored by the law and will be strictly construed against the party relying thereon. When considered valid, it is generally upon the ground that no considerations of public policy are present which would override the fundamental right of freedom of contract." *Pride v. Southern Bell Tel. & Tel. Co.,* 244 S.C. 615, 619, 138 S.E.2d 155, 157 (1964).

This exculpatory clause in this private contract is against public policy in that the parties are not on equal bargaining terms and the telephone company has created a public interest in the publication of the yellow pages which requires that the telephone company perform its private duty to the ad subscriber without negligence or be held for damages. The *Pride* case held the issue of public policy of such clause open for proof. In this case the proof is in the record.

The case of *Allen v. Mich. Bell Telephone Co.,* 18 Mich. App. 632, 637–40, 171 N.W.2d 689, 692–94 (1969), is the only case from all courts considering the merits of the telephone company's exculpatory clause to find it to be against public policy.[7] The reasoning of that case is valid and persuasive. It stated:

---

[7] The Wisconsin court has in the past been with the minority decisions of other states as early as 1906 in *Nunnemacher v. State,* 129 Wis. 190, 198, 108 N.W. 627 (1906), we stated:

"We are fully aware that the contrary proposition has been stated by the great majority of the courts of this country, in-

"Implicit in the principle of freedom of contract is the concept that at the time of contracting each party has a realistic alternative to acceptance of the terms offered. Where goods and services can only be obtained from one source (or several sources on non-competitive terms) the choices of one who desires to purchase are limited to acceptance of the terms offered or doing without. Depending on the nature of the goods or services and the purchaser's needs, doing without may or may not be a realistic alternative. Where it is not, one who successfully exacts agreement to an unreasonable term cannot insist on the courts enforcing it on the ground that it was 'freely' entered into, when it was not. He cannot in the name of freedom of contract be heard to insist on enforcement of an unreasonable contract term against one who on any fair appraisal was not free to accept or reject that term.

"There are then two inquiries in a case such as this: (1) What is the relative bargaining power of the parties, their relative economic strength, the alternative sources of supply, in a word, what are their options?; (2) Is the challenged term substantively reasonable?

" 'Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' *Williams v. Walker-Thomas Furniture Company* (1965), 121 App. D.C. 315, (350 F.2d 445, 449, 18 A.L.R.3d 1297).

"Thus, merely because the parties have different options or bargaining power, unequal or wholly out of proportion to each other, does not mean that the agreement of one of the parties to a term of a contract will not be enforced against him; if the term is substantively reasonable it will be enforced. By like token, if the provision is substantively unreasonable, it may not be enforced without regard to the relative bargaining power of the contracting parties.

". . . .

"The parties to this suit are not in positions of equal bargaining power. It is common knowledge that defend-

cluding the supreme court of the United States. The unanimity with which it is stated is perhaps only equaled by the paucity of reasoning by which it is supported."

ant's yellow pages is the only directory of classified telephone listings freely distributed to all the telephone subscribers in the Flint area. . . .

" . . . .

"We believe the law in Michigan to be that, where goods or services used by a significant segment of the public can be obtained from only one source, or from limited sources on no more favorable terms, an unreasonable term in a contract for such goods or services will not be enforced as a matter of public policy."

On the issue of unconscionability of contract terms, writers have divided the factors into "procedural" and "substantive" categories. *See* J. White and R. Summers, Uniform Commercial Code, secs. 4–3 to 4–7 at 118–30 (1972) and *Johnson v. Mobil Oil Corp.*, 415 F. Supp. 264, 268 (E.D. Mich. 1976).

"Under the 'procedural' rubric come those factors bearing upon what in the *Weaver* case was called the 'real and voluntary meeting of the minds' of the contracting parties: age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, whether there were alternative sources of supply for the goods in question. The 'substantive' heading embraces the contractual terms themselves, and requires a determination whether they are commercially reasonable."

The balancing approach is applied to the unconscionability question. To tip the scales in favor of unconscionability requires a certain quantum of procedural plus a certain quantum of substantive unconscionability. *See* White & Summers, *supra*, at 128.

When considering the procedural and substantive factors in the relationship of the parties to this exculpatory contract, the balancing tips in favor of a finding that the clause is unconscionable and against public policy and we so find.

The telephone company encourages the public to "let your fingers do the walking" through the yellow pages. In the present case, due to the company's negligent publication of the quarter-page ad, the public walked right by the plaintiff's ad since it did not include the significant and commercially important words "Discount Fabric House." To the unfamiliar consumer looking in the yellow pages for drapery establishments, those words may not have stirred up existing knowledge of reputation of the business but at least the word "Discount" would have meant drapes at less than face value, or in other words, a bargain price. (Funk & Wagnalls Desk Standard Dictionary: "discount . . . 2. to buy for less than face value, the difference going to the purchaser.")

As early as *William H. Schwanke, Inc. v. Wisconsin Tel. Co.*, 199 Wis. 552, 558, 227 N.W. 30 (1929), this court held:

"A telephone directory is an indispensable element of telephone service. Without such a directory the presence of a telephone in a place of business is of negligible value. When a telephone company contracts to furnish telephone service it impliedly agrees to place the subscriber's name and the telephone number in its directory when that directory is issued in due course of business. Its failure to do so constitutes a breach of contract, and it is plainly liable upon general principles for damages resulting from such breach."

Although that case presumably involved the white pages and a negligent listing of the plaintiff's business telephone number, it is applicable in the present case since the yellow pages have become, due to the telephone company's commercial efforts, an indispensable element of telephone service. If not, why is a free yellow pages book supplied to every customer, private or commercial, and one book for every telephone line. Wherever there is a telephone outlet, the telephone company makes sure

that a yellow pages book is located there. In *Schwanke* the court handled the problem of proving more than speculative damages by reviewing the record and holding: "The record is barren of any evidence to indicate the loss of a single sale by reason of the error in the telephone book." *Id.* at 557.

The trial court was correct on this record when it held:

"The Court believes that the yellow pages are a necessary form of advertising for small businesses; that there is no equal competitive method to the yellow pages for telephone advertisement; that the customer was unable to bargain for the terms and conditions; and, that the customer was compelled to accept the printed form.

"The Court is satisfied that the plaintiff did not have a meaningful choice, that the defendant had the bargaining power in a gross unbalanced manner in determining the terms and conditions in the directory advertisement which was an indispensable element of telephone service. The customer did not have a free choice nor did he have bargaining power."

The clause did not allow reasonable damages; it gave back only what the telephone company had no right to retain due to its own negligence, even if it allowed for a pro rata return based on the degree of harm done. This exculpatory clause in the modern commercial world is unconscionable and unenforceable since it is contrary to public policy.

*By the Court.*—The decision of the court of appeals is reversed.