Jerilyn RICHARDS, Plaintiff-Appellant-Petitioner,

v.

Leo J. RICHARDS, Defendant,

MONKEM COMPANY, INC., Defendant-Respondent.

Supreme Court

*No. 92–1690. Oral argument November 10, 1993.——Decided March 8, 1994.*

(Also reported in 513 N.W.2d 118.)

1008

1009

For the plaintiff-appellant-petitioner there were briefs by *David M. Erspamer* and *Erspamer Law Office,* Amery and oral argument by *David M. Erspamer.*

For the defendant-respondent there was a brief by *Mark E. Coe* and *Coe, Dalrymple, Heathman, Coe & Zabel, S.C.,* Rice Lake and oral argument by *Mark E. Coe.*

ABRAHAMSON, J. This is a review of an unpublished decision of the court of appeals filed on January 20, 1993, affirming a judgment of the circuit court for Barron County, Edward R. Brunner, Circuit Judge. The circuit court granted summary judgment to Monkem Company, the defendant, dismissing the complaint with prejudice. It held that the form signed by Jerilyn Richards, the plaintiff, was an exculpatory contract that was not void or unenforceable as contrary to public policy. It further held that the plaintiff's claim for injuries suffered while riding as a passenger in a truck operated by Leo Richards, her husband, and owned by Monkem Company, her husband's employer, was clearly within the contemplation of the parties at the time the exculpatory contract was executed. The circuit court thus foreclosed the plaintiff's claim as a matter of law. The court of appeals affirmed the judgment of the circuit court. We reverse and remand for further proceedings.

The issue before this court is whether the form the plaintiff executed constitutes a valid exculpatory contract releasing the plaintiff's claims against Monkem Company, thereby barring this lawsuit. This issue arose in a motion for summary judgment, and this

court is reviewing a decision affirming the summary judgment. Therefore the standard of review is the same as the standard used by the circuit court to determine whether to grant the motion for summary judgment. *Dobratz v. Thomson,* 161 Wis. 2d 502, 513, 468 N.W.2d 654 (1991). If an exculpatory contract is found to be invalid on its face, the defendant's motion for summary judgment will be denied. *Dobratz v. Thomson,* 161 Wis. 2d at 526. Thus, this court must determine whether, as a matter of law, the form was a valid exculpatory contract that bars the plaintiff's claim.

We conclude that the form at issue here is an exculpatory contract void as against public policy. As is often the case, neither a prior decision of the court nor the facts of a prior case is directly on point. An examination of the principles underlying the determination of the validity of exculpatory contracts leads us to the conclusion that the form is an unenforceable exculpatory contract due to a combination of three factors. None of these factors alone would necessarily invalidate the release; however, taken together they demand the conclusion that the contract is void as against public policy. First, the contract serves two purposes, not clearly identified or distinguished. Second, the release is extremely broad and all-inclusive. Third, the release is in a standardized agreement printed on the Company's form, offering little or no opportunity for negotiation or free and voluntary bargaining.

The facts relevant to our determination of the validity of the form as an exculpatory contract are not in dispute. In February of 1990, Leo Richards was hired by Monkem Company as an over-the-road truck driver. Shortly thereafter, the plaintiff and her husband discussed the possibility of her riding as a

passenger with him. Before the plaintiff could accompany her husband, however, Monkem Company required that she sign a form entitled "Passenger Authorization," and she did so on or about May 22, 1990.

The "Passenger Authorization" form used by Monkem Company appears to have two purposes. First, it served as Monkem Company's authorization to the passenger to ride in a company truck. Second, it serves as a passenger's general release of all claims against the Company. The language of release attempts to transform the "Passenger Authorization" form into an exculpatory contract relieving Monkem Company and all of its affiliated companies, partnerships, individuals and corporations (as well as others) from any and all liability for harm to the person signing the form. *See Merten v. Nathan,* 108 Wis. 2d 205, 210, 321 N.W.2d 173 (1982). The form reads as follows:

## Monkem Company, Inc.
### A BURLINGTON MOTOR CARRIER

PASSENGER AUTHORIZATION

DATE: 5/22/90

FULL AND FINAL RELEASE COVERING ALL CLAIMS OR RIGHTS OF ACTION OF EVERY DESCRIPTION PAST, PRESENT OR FUTURE.

I/WE BEING OF LAWFUL AGE, FOR MYSELF/OURSELVES, MY/OUR HEIRS, ADMINISTRATORS, EXECUTORS, SUCCESSORS, AND ASSIGNS, HEREBY FULLY AND FOREVER RELEASE AN DISCHARGE THE SAID MONKEM COMPANY, INC., AND ALL AFFILIATED, ASSOCIATED, OR SUBSIDIARY COMPANIES, PARTNERSHIPS, INDIVIDUALS OR CORPORATIONS AND ALL OTHER PERSON, FIRMS, AND CORPORATIONS, AND THEIR HEIRS, ADMINISTRATORS, EXECUTORS, SUCCESSORS, AND ASSIGNS FROM ANY AND ALL ACTIONS, CAUSES OF ACTIONS, CLAIM AND DEMANDS OF WHATSOEVER KIND OR NATURE ON ACCOUNT OF ANY AND ALL KNOWN AND UNKNOWN INJURIES, LOSSES, AND DAMAGES BY ME/US OR MY/OUR PROPERTY SUSTAINED OR RECEIVED WHILE A PASSENGER IN ANY AND ALL EQUIPMENT, VEHICLES, OR WHILE LOCATED ON ANY/ALL MONKEM COMPANY, INC.,/JOPLIN HIWAY, INC. PROPERTY

IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT THIS RELEASE IS INTENDED TO COVER AND DOES COVER NOT ONLY ALL NOW KNOWN INJURIES, LOSSES AND DAMAGES, BUT ANY FUTURE INJURIES, LOSSES AND DAMAGES NOT NOW KNOWN OR ANTICIPATED, BUT WHICH MAY LATER DEVELOP OR BE DISCOVERED, INCLUDING ALL THE EFFECTS AND CONSEQUENCES THEREOF.

PERMISSION IS GRANTED BY MONKEM COMPANY, INC. FOR JERILYN RICHARDS TO BE A PASSENGER IN MONKEM COMPANY, INC./JOPLIN HIWAY INC./BURLINGTON MOTOR CARRIER LEASING VEHICLE UNIT NUMBER 42424 FOR A PERIOD STARTING 6/1/90 AND ENDING 9/1/90 . THIS PERMISSION IS GIVEN ONLY UPON FULL UNDERSTANDING OF THE ABOVE RELEASE AND IS ACCEPTED AND EXECUTED AND ACKNOWLEDGED BY SIGNATURE OF THE PERSON BELOW:

ABSOLUTELY NO DRIVING PRIVILEGES

SIGNED
DRIVER SIGNATURE - E.S.L. RICHARDS

SIGNED
PASSENGER SIGNATURE - JERILYN RICHARDS - WIFE

e.l. mc Carley
C.L. MC CARLEY, DIRECTOR OF RISK MGT.
OR DAVE BROWN, DIRECTOR OF SAFETY

PASSENGER INFORMATION

HEIGHT: 5' 4"
WEIGHT: 140
HAIR COLOR: BRN
EYE COLOR: BRN
DR. LIC. #K400 H365 6501 04
SS # 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

A SIGNED COPY MUST BE RETURNED TO MONKEM WITHIN 10 DAYS OF ISSUANCE.

P. O. Box 1196 · Joplin, Missouri 64802 · (417) 624-5634

1013

In addition, the form contains an insert asking for the passenger's height, weight, hair color, eye color, driver's license number, and social security number. The appropriate information about the plaintiff was inserted on the form. The release was signed by Leo Richards as driver, Jerilyn Richards as passenger, and C.L. McCarley, Director of Risk Management for Monkem Company.

On June 14, 1990, the plaintiff accompanied her husband on one of his scheduled trips. When the truck, negotiating a left curve, overturned, the plaintiff was pinned inside the vehicle. The injuries she sustained as a result of this accident are the basis for the current lawsuit.

The principles applicable to the determination of the validity of exculpatory contracts were recently set forth by the court in *Dobratz v. Thomson,* 161 Wis. 2d 502, 514–20, 468 N.W.2d 654 (1991), which incorporated, explained, and elaborated on the principles set forth in several earlier cases. *See, e.g., Discount Fabric House v. Wisconsin Telephone Co.,* 117 Wis. 2d 587, 345 N.W.2d 417 (1984) (contract releasing liability of telephone company for negligent omission of ad from yellow pages); *Arnold v. Shawano Co. Agr. Socy,* 111 Wis. 2d 203, 330 N.W.2d 773 (1983) (contract releasing liability of race track to driver), *overruled on other grounds, Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 314, 401 N.W.2d 816 (1987); *Merten v. Nathan,* 108 Wis. 2d 205, 321 N.W.2d 173 (1982) (contract releasing liability of horseback riding school to pupil); and *College Mobile Home Park & Sales v. Hoffmann,* 72 Wis. 2d 514, 241 N.W.2d 174 (1976) (contract releasing liability of landlord to tenant).

■

We now reiterate several of the principles from these cases which are relevant to the case at bar. Exculpatory contracts are not favored by the law because they tend to allow conduct below the acceptable standard of care applicable to the activity. Exculpatory contracts are not, however, automatically void and unenforceable as contrary to public policy. *Arnold v. Shawano Co. Agr. Socy,* 111 Wis. 2d 203, 209, 330 N.W.2d 773 (1983), *overruled on other grounds, Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 314, 401 N.W.2d 816 (1987); *Dobratz v. Thomson,* 161 Wis. 2d 502, 514, 468 N.W.2d 654 (1991). Rather, a court closely examines whether such agreements violate public policy and construes them strictly against the party seeking to rely on them. *Merten v. Nathan,* 108 Wis. 2d 205, 211, 321 N.W.2d 173 (1982).

■

In determining whether an exculpatory agreement violates public policy and is therefore void, courts recognize that public policy is not an easily defined concept. The concept embodies the common sense and common conscience of the community. Public policy is that principle of law under which "freedom of contract is restricted by law for the good of the community." *Merten v. Nathan,* 108 Wis. 2d 205, 213, 321 N.W.2d 173 (1982) (quoting *Higgins v. McFarland,* 86 S.E.2d 168, 172 (Va. 1955). An exculpatory agreement will be held to contravene public policy if it is so broad "that it would absolve [the defendant] from any injury to the [plaintiff] for any reason." *College Mobile Home Park & Sales v. Hoffmann,* 72 Wis. 2d 514, 521–22, 241 N.W.2d 174 (1976). See also *Arnold v. Shawano Co. Agr. Socy,* 111 Wis. 2d 203, 210, 330 N.W.2d 773 (1983), citing *College Mobile Home Park* with approval. In *Dobratz v.*

1015

*Thomson,* 161 Wis. 2d 502, 520, 468 N.W.2d 654 (1991), a unanimous court, striking down an overly broad release, stated that "this court will not favor an exculpatory contract that is broad and general in its terms."

In reviewing an exculpatory agreement for violation of public policy, a court attempts to accommodate the tension between the principles of contract and tort law that are inherent in such an agreement. The law of contract is based on the principle of freedom of contract; people should be able to manage their own affairs without government interference. Freedom of contract is premised on a bargain freely and voluntarily made through a bargaining process that has integrity. Contract law protects justifiable expectations and the security of transactions. The law of torts is directed toward compensation of individuals for injuries resulting from the unreasonable conduct of another. Tort law also serves the "prophylactic" purpose of preventing future harm; tort law seeks to deter certain conduct by imposing liability for conduct below the acceptable standard of care. *Merten v. Nathan,* 108 Wis. 2d 205, 211–212, 214, 321 N.W.2d 173 (1982).

Applying these principles to this case we conclude that the exculpatory contract at issue is void as against public policy. In this case, the public policy "of imposing liability on persons whose conduct creates an unreasonable risk of harm" outweighs the public policy of "freedom of contract." *Merten v. Nathan,* 108 Wis. 2d 205, 215, 321 N.W.2d 173 (1982). Accordingly we conclude that it would be contrary to public policy to enforce the exculpatory language in Monkem Company's "Passenger Authorization" form. A combination of three factors in this case leads us to this conclusion.

First, the contract serves two purposes, not clearly identified or distinguished. As we stated previously, those purposes appear to be: (1) the Company authorizes the passenger to ride in a Company truck, and (2) the passenger releases the Company and others from liability. This dual function, however, is not made clear in the title of the contract; the form is designated merely as a "Passenger Authorization." The written terms clearly state that the document is a release of liability. A person signing a document has a duty to read it and know the contents of the writing. *State Farm Fire & Casualty Co. v. Home Ins. Co.,* 88 Wis. 2d 124, 129, 276 N.W.2d 349 (Ct. App. 1979). Nevertheless it is not reasonably clear to the signer of a form entitled "Passenger Authorization" that the document would in reality be the passenger's agreement to release the Company (and others) from liability. Rather the title "Passenger Authorization" implies that only the Company is making the concessions and only the Company is bound. We conclude that in this case the release should have been conspicuously labelled as such to put the person signing the form on notice. Moreover, to prevent confusion under these circumstances, the passenger's release of the Company from liability should have been carefully identified and distinguished from the Company's authorization for a passenger to ride along. Identifying and distinguishing clearly between those two contractual arrangements could have provided important protection against a signatory's inadvertent agreement to the release.

Second, the release is extremely broad and all-inclusive. It purports to excuse intentional, reckless, and negligent conduct not only by the Company but by

another entity (Joplin Hiway, Inc.) and by all affiliated, associated, or subsidiary companies, partnerships, individuals, or corporations, and all other persons, firms or corporations. Further, although the passenger's release is combined with the Company's authorization to the plaintiff to ride in a specified Company vehicle during a specified period, the release does not refer to an injury the plaintiff may sustain while riding as a passenger in the specified Company vehicle during the specified time period. It purports to release the Company from liability for any and all injury to the plaintiff while the plaintiff is a passenger in any vehicle (not necessarily one owned by the Company) at any time and while the plaintiff is on any and all Company property at any time. The release, unlike the authorization, is not limited to a specified vehicle or to a specified time period. Had the Company intended that it be released from liability to the plaintiff while she was riding with her husband in the Company truck during the period the Company authorized, that is not what the release says. The very breadth of the release raises questions about its meaning and demonstrates its one-sidedness; it is unreasonably favorable to the Company, the drafter of the contract.

With respect to overly broad releases, three lines of cases have developed. In *College Mobile Home Park & Sales v. Hoffmann,* 72 Wis. 2d 514, 241 N.W.2d 174 (1976), the court concluded that an exculpatory contract contravenes public policy when it would absolve the tortfeasor from any injury to the victim for any reason. In *Arnold v. Shawano Co. Agr. Socy,* 111 Wis. 2d 203, 330 N.W.2d 773 (1983), the court remanded the summary judgment case to the circuit court to determine at trial whether the accident was within the contemplation of the parties to a release which the

court characterized as broad and ambiguous. In contrast, in *Dobratz v. Thomson,* 161 Wis. 2d 502, 468 N.W.2d 654 (1991), the court struck down on summary judgment a broad release on the ground that it was ambiguous and unclear, and that, as a matter of law, no contract was formed. The facts of the three cases are different and determined the outcomes. In regard to the issue of overly broad releases, however, the court's resolution of the effect of the overly broad releases in *College Mobile Home Park & Sales* and *Dobratz* is more pertinent to the very broad and inclusive release in the case at bar than is the court's treatment of the more limited release in the *Arnold* case.

Third, this contract is a standardized agreement on the Company's printed form which offers little or no opportunity for negotiation or free and voluntary bargaining. According to the record, when the Company forwarded the form to the plaintiff its cover letter did not advise her that the document was a release of all claims and did not advise her of the legal significance attached to her signing of the document. The employee handbook advised employees that Company authorization was needed for a passenger to ride along but did not advise employees that the passenger would have to release all claims against the Company.

The fact that a release is printed in a standardized form is not, by itself, enough to invalidate it. However, the plaintiff's lack of an opportunity for discussing and negotiating the contract is significant when considered with the breadth of the release. If her plans to ride with her husband were to go forward, the plaintiff simply had to adhere to the terms of the written form. While the Company had the time and resources to draft the provisions and plan their effect, the plaintiff did not.

Had the plaintiff been afforded the opportunity to negotiate a release, she might have declined to release the Company from liability for intentional or reckless actions or the driver's negligence, or from liability for its defective equipment. Because the Company probably derives some benefit from allowing family members to join drivers on the road, such as improving employee morale, the Company might not necessarily have rejected such proposals out of hand.

As we have said, none of these factors alone would necessarily have warranted invalidation of the exculpatory contract. Under the circumstances in the case at bar, a combination of these factors demonstrate that adherence to the principle of freedom of contract is not heavily favored. The principle of tort law, to compensate persons for injuries resulting from unreasonable conduct of another, prevails. Accordingly, we conclude that the document contravenes public policy and is void and unenforceable. The decision of the court of appeals is reversed and the cause remanded for proceedings not inconsistent with this opinion.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded to the circuit court.

DAY, J. *(dissenting).* Leo J. Richards (Mr. Richards) was a truck driver in the employ of Monkem Company, a trucking company. Jerilyn Richards (Mrs. Richards), his wife, wished to travel in the truck with Mr. Richards during one of his trips. The release at issue was signed by Mrs. Richards and her husband as a condition for allowing Mrs. Richards to travel with her husband while he drove a truck owned by Monkem Company. The release was broad, but it was clearly within the contemplation of the parties that the release

would cover an injury to Mrs. Richards while riding as a passenger in the truck during an accident caused by her husband's negligence.

The majority opinion lists three reasons which purportedly require invalidation of the release as a matter of law. The reasons given are: (1) "the contract serves two purposes, not clearly identified or distinguished"; (2) "the release is extremely broad and all-inclusive"; (3) "the release is in a standardized agreement printed on the Company's form, offering little or no opportunity for negotiation or free and voluntary bargaining." 181 Wis. 2d at 1011. I dissent as to each reason given by the majority opinion for invalidating this release, and I dissent as to their application in "combination."

I agree that exculpatory releases are not generally favored and, therefore, will be construed strictly. *Arnold v. Shawano County Agr. Society,* 111 Wis. 2d 203, 209, 330 N.W.2d 773 (1983); *Dobratz v. Thomson,* 161 Wis. 2d 502, 514, 468 N.W.2d 654 (1991). However, the fact that exculpatory releases are "not favored" does not mean that the majority should invent new "rules" without precedent or support. None of the reasons cited by the majority justifies summary invalidation of this release. This the majority admits. Nor is summary invalidation of this release justified by these "reasons" in some unspecified "combination." Whether in "combination" or not, reasons (1) and (3) are "rules" created in this opinion, and reason (2) does not lead to automatic invalidation. The whole is not more than the sum of the parts here. None of these rationales justifies invalidation of the release as a "matter of law," and the facts of this case neither warrant nor support the rules created by the majority, whether applied singly or in combination. I would hold

that the release should be enforced to the extent it covers what was clearly contemplated by the parties when executing the release. The accident which occurred was clearly the kind of occurrence contemplated in the release.

The first reason given by the majority opinion for invalidating the release as against "public policy" is that the release "serves two purposes." 181 Wis. 2d at 1011. There is no such "rule," however. No legal authority is cited by anyone, neither the parties nor the majority opinion, to support such a rule. Quite simply, this "rule" appears for the first time in the majority opinion. Moreover, this new "rule" conflicts with legal precedent and serves no practical purpose.

The majority opinion disapproves the fact that the release serves not only to release claims against the company but that it also serves to document the company's authorization of a passenger. However, a release in the present circumstances is best viewed as condition that must be met before permission is granted. Since permission is not given until the condition is met, the release must necessarily serve two purposes. By definition, it serves both to release claims and to satisfy a condition for permission. The signed release merely documents that the condition has been met.

This practice is quite common. Many cases have enforced releases which serve both to release claims and to document that permission has been granted upon satisfaction of the condition. For instance, most jurisdictions routinely enforce releases which were the condition for granting permission to applicants and participants in races and other recreational activities. *See, Hammer v. Road America, Inc.,* 614 F. Supp. 467, 470 (E.D.Wis. 1985), *aff'd.,* 793 F.2d 1296 (7th Cir.

1986); *Arnold,* 111 Wis. 2d at 213 n.4. Both *Arnold* and *Merten v. Nathan,* 108 Wis. 2d 205, 321 N.W.2d 173 (1982), involved releases which then served as conditions for participation. Neither of those opinions indicates any problem with that fact. Quite simply, there is no rule that a release "serving two purposes" must be invalid. There is no rule that a release "serving two purposes" is even presumptively invalid.

The only way that "serving two purposes" could lead to invalidation of a release is if "serving" the second purpose made an otherwise clear release unclear. For instance, one can conceive of a situation in which the addition of information extraneous to the release is interwoven with the language of the release in such a way that the release itself is made unclear. The release would therefore be unenforceable to the extent it was rendered unclear. *see Arnold,* 111 Wis. 2d at 211. Problems would also arise if a phrase or two containing release language were buried within a document otherwise devoted to matters unrelated to the release, so that it became unclear that a release was even contained within the document. *See, e.g. Restatement (Second) of Torts* § 496B, Comment C. Neither of these situations is present here, however.

Mrs. Richards complained that the release was invalid as a matter of law because the release document also served to satisfy federal requirements for information about passengers authorized to accompany truck drivers. However, as discussed above, there is no rule of law which suggests that a signed release may not be used to serve any number of purposes. Nor is there any reason why a document containing a release may not solicit other information from the signatory so long as the release itself remains clear.

1023

The majority opines that "to prevent confusion under these circumstances, the passenger's release of the Company from liability should have been carefully identified and distinguished from the Company's authorization for a passenger to ride along." 181 Wis. 2d at 1017. However, besides the fact that there was no evidence of confusion in the record, there is no basis in fact or in law to even claim confusion in this case.

First, the release itself was clearly a release by its terms, and its function as a release was not obscured by the addition of a separate section asking for identification information about the passenger.

The "PASSENGER AUTHORIZATION" is a one-page document consisting of two sections. The first section is entitled: "FULL AND FINAL RELEASE . . ." followed by the body of the release. The body of the release occupies approximately ⅔ of the page and is written in capital lettering. The word "RELEASE" appears no less than four times in the release. In fact, no other single word with more than four letters appears more often in the release than the word "RELEASE"; only the name "MONKEM COMPANY" appears as many times as the word "RELEASE" in the release. The title to the release uses the word "RELEASE"; the final sentence before the signature portion of the release uses the word "RELEASE"; and the word "RELEASE" appears prominently in both of the two intervening paragraphs of the release. The final sentence of the release, located just above the space where the passenger applicant and driver are to sign, states: "THIS PERMISSION IS GIVEN ONLY UPON FULL UNDERSTANDING OF THE ABOVE RELEASE AND IS ACCEPTED AND EXECUTED AND ACKNOWLEDGED BY SIGNATURE OF THE PERSON BELOW:". Both Mrs. Richards and her hus-

1024

band signed the release in the appropriate space immediately following that statement.

The second section of the document, entitled, "PASSENGER INFORMATION," is located in the lower right hand corner of the document. It consists of entry blanks for the height, weight, hair color, eye color, driver's license number and social security number of the passenger. It occupies less than two square inches of space on the document. This section is clearly neutral, if not innocuous.

Any claim that the presence of the passenger information section could confuse anyone into believing that the rest of the document ceased to be a release is completely untenable. It is especially untenable when alleged by someone such as Mrs. Richards who did not even read or fill-out the passenger information section. *See,* footnote number 1, *infra.*

The majority concedes that the facts relevant to the determination of the validity of the release are not in dispute. 181 Wis. 2d at 1011. Those undisputed facts include the following:

Mrs. Richards claims in her brief that it was "undisputed that despite reasonable diligence by the plaintiff to find out the purpose of this agreement, she did not know and was not advised that the agreement was an exculpatory contract." And she claims that she "went through efforts to find out the reason for the agreement." Her "efforts," however, evidently did not include reading the release itself. Mrs. Richards' deposition testimony indicates that she did not read much of the document and did not read carefully those parts she may have read.[1] Her efforts did not include asking the company any questions or even indicating any dis-

---

[1] The following are excerpts from Mrs. Richards' deposition. (Record, 12:26–27, 29–30).

Q: And you read the complete document from top to bottom?

A: No.

Q: You didn't read the complete document. What did you read and what did you not read?

A: That it was basically it. From the top you can tell and from the memo it was a Passenger Authorization and down here that I needed to make a signature where my name was typed.

Q: Did you read the first paragraph commencing with 'Full and final release' ending with the word 'future'?

A: I may have.

Q: And did you read the second paragraph commencing with 'I/we' ending with 'property'?

A: I didn't understand it enough to read it.

Q: Well, did you read it?

A: I can't recall for sure if I read it or not, the whole thing.

Q: Did you read the third paragraph commencing with the words 'It is expressly' ending with the words 'consequences thereof'?

A: I don't recall if I read what exact parts for sure of all or any of the document.

Q: All right. Likewise, Paragraph 4 commencing with the words 'Permission is granted' ending with the words 'person below:'?

[Mrs. Richards' attorney]: Okay. Same answer as previously, that you don't know if you read it or not?

A: Yes. I don't know . . ..

Q: Do you know who inserted the information concerning the passenger that's on the right-hand portion of the lower third of the document?

A: No, I don't.

Q: Is that your handwriting?

A: I do not believe that it is . . ..

Q: Did you read that it was a release of all claims that you may have against Monkem Company for riding as a passenger?

A: I'm not sure.

1026

include reading the memo from the company carefully, and her efforts did not include contacting the Director of Risk Management referred to in the employee [student] handbook. Thus, when the majority opinion argues that "it is not reasonably clear to the signer of a form entitled 'Passenger Authorization' that the document would in reality be the passenger's agreement to release the Company (and others) from liability," 181 Wis. 2d at 1017 it refers to no more than Mrs. Richards herself remembers reading carefully, namely, the first two words at the top of the document.

Q: Did you understand that this authorization was also a release of future causes of action or future claims that you may have against Monkem Company for riding as a passenger or being injured while riding as a passenger with Monkem?

A: I didn't understand it to mean that.

Q: Did you seek any assistance prior to signing this with regard to the portions that you've indicated that you did not understand?

A: No, I did not.

Q: So even though you didn't understand some of the contents of this authorization, you went ahead and signed it anyway?

A: Yes . . ..

Q: Did you discuss with Mr. Richards, your husband, the fact that [the Passenger Authorization] not only released or authorized you to ride as a passenger but released claims that you may have for being injured while riding as a passenger with Mr. Richards in a Monkem vehicle?

A: I did mention to him that I didn't understand it, and he had talked to someone, a secretary or someone at Monkem, and she just said that it just needed to be signed before I could go with him was what I understood from what he had told me from the conversation with her.

Q: Did you talk to the secretary?

A: No, I did not.

I agree with the court of appeals when it concludes that, "Jerilyn's assertions that she did not understand the language of the exculpatory contract but signed it anyway are insufficient to invalidate its effect. Failure to read or understand a contract will generally not affect its validity because a court will not protect a person who fails to take reasonable steps for her own protection." *Richards v. Richards,* 173 Wis. 2d 908, 499 N.W.2d 301 (Table), 1993 WL 8053 (Wis. App.), p. 2, (Unpublished Opinion). There is no reason why this court should credit Mrs. Richards' claim that she was or even could have been somehow confused about this being a release.

Nor is it credible on the facts as alleged to suggest or imply that Mr. Richards was somehow confused. As his deposition indicates, he knew that the Passenger Authorization contained a release. He knew that the release was required because Monkem Company was worried about accidents involving passengers. He admits that he did not read the release before signing it, and he admits that he did not ask anyone at Monkem Company to clarify it for him. There is no clear evidence that he read the student handbook carefully as to this issue, much less that he was, or in any way could have been, confused that this was a release. Rather he admits that all drivers knew ahead of time about the requirements.[2] Thus, clearly, if Mrs. Rich-

---

[2] The following are excerpts from Mr. Leo J. Richards' deposition. (Record, 11:23–24, 26–27).

Q: Was reference made to [the passenger] authorization [form]?

A: Well, we knew by federal law that you had to have a rider's permit for any passenger, and they mentioned that we would have to get one and that the only passengers they would authorize was immediate family.

ards was confused because she relied upon Mr. Richards' explanations of the release without really reading the release and without asking the company for clarification, that is her fault, and not any confusion caused by Monkem or the structure or wording of the document, as a matter of law.

The second reason given for invalidation of the release by the majority opinion is that the release is "extremely broad and all-inclusive." 181 Wis. 2d at 1011. I agree that the release is very broad. However, it is *not* the law in Wisconsin that just because a release is "extremely broad and all-inclusive" that it is *auto-*

Q: And did [Monkem Company] indicate a purpose for that authorization?

A: Yeah.

Q: What was that purpose that was communicated to you?

A: Well because they have a high percentage of accidents of passengers getting in and out of the vehicle, and they had to sign the release, and they also had to have a doctor's statement that they're physically able to climb in and out of the vehicle . . . .

Q: Did the secretary in the Safety Office [at Monkem Company] explain the purpose that they—or the reason that they required [the passenger authorization] to be executed?

A: No. No. All drivers know that you have to have a Passenger Authorization. Even if you own the vehicle yourself, you still have to make one out.

Q: Prior to signing that agreement or that authorization did you have an opportunity to read it?

A: I glanced at it, but it's all legal mumbo jumbo, you know . . . .

Q: Okay. Did you question anybody concerning its contents prior to signing it?

A: No.

Q: So you signed the agreement even though you didn't understand what it said?

A: Well, the only thing I looked at was to see that my truck number and stuff was right, and that's about all . . . .

1029

*matically* void as against public policy. This court held in *Arnold,* 111 Wis. 2d at 211, that the rule on broad and general exculpatory releases is as follows: "Exculpatory agreements that are broad and general in terms will bar only those claims that are within the contemplation of the parties when the contract was executed."[3]

It must be emphasized that Mrs. Richards does *not* argue that the release was so obtuse that it could not be understood. Rather, Mrs. Richards argues that the release should be invalid because it is overbroad. Mrs. Richards complains that, "[i]t was simply impossible for the parties to contemplate the scope and breadth of the purported damages and actions that they were releasing." That may be true, but this case does not involve any bizarre hypotheticals, and the rule is that the parties will be held to what was clearly contemplated in the situation.

---

[3] *Arnold* was *overruled on other grounds, Green Springs Farms v. Kersten,* 136 Wis. 2d 304, 317, 401 N.W.2d 816 (1987). The rule as concerns overbroad exculpatory clauses in *Arnold* was reaffirmed in *Dobratz,* 161 Wis. 2d at 523, 525. *Dobratz,* at 523, holds that no contract was formed in that case owing to the uncertainty and ambiguity of the document. It distinguishes that situation from cases involving overbroad exculpatory clauses. *Dobratz,* at 525, explicitly approves of *Arnold* and *Trainor v. Aztalan Cycle Club, Inc.,* 147 Wis. 2d 107, 432 N.W.2d 626 (Ct. App. 1988) in how they handle overbroad release analysis. Nor does *College Mobile Home Park & Sales v. Hoffmann,* 72 Wis. 2d 514, 241 N.W.2d 174 (1976) stand for the proposition that broad leases in any or all subject areas may be held invalid just because they are broad. It specifically sets its holding in the framework of the public policy in landlord-tenant law, and has been interpreted by subsequent cases as an example of landlord-tenant law. *see Arnold,* 111 Wis. 2d at 210.

Thus the proper question in this context is what was clearly contemplated by the parties. Was it clearly contemplated that the release would cover Monkem? Was it clearly contemplated that the release would cover an accident in which Mrs. Richards was injured while riding as a passenger in the truck? And was it clearly contemplated that this release would prevent Mrs. Richards from recovering against the company for acts of negligence caused by her husband while driving Monkem's truck? The answer to each of these questions is "yes."

These questions may be determined as a matter of law. In *Plummer v. Leonhard,* 44 Wis. 2d 686, 692, 172 N.W.2d 1 (1969), citing 76 *C.J.S. Release* § 72 (1952), this court noted that normally the determination of the intent of the parties to a release, and the scope of a release, are questions of fact for the jury. However, the meaning, construction, and legal effect of a release are questions for determination by the court, where there is no ambiguity in the instrument, or where the evidence in connection with the release is undisputed. Specifically, the construction of a written release as operating to discharge particular claims is a determination made by the court. *See,* 76 *C.J.S. Release* § 72 (1952); and *Arnold,* 111 Wis. 2d at 212.

As to the first question, Mrs. Richards *admits* that the release is clear in its intent to release liability as to Monkem. "Obviously," Mrs. Richards writes in her brief, "the release itself purports to excuse negligence not only on behalf of Leo Richards' employer, Monkem Company, but in addition purports to release liability on behalf of some separate entity known as 'Joplin Hiway, Inc.' " Her complaint at that point is that the identity of Joplin Hiway, Inc., etc., is not given, and therefore the scope of the release is overbroad. I might

1031

agree that the enforcement of the release as to unknown or undefined entities may or may not be permissible under the terms of this release. That is an open question. However, the fact that the release "obviously" covered Monkem means that was clearly contemplated by the parties and should therefore be enforced to that extent.

As to the second question, Mrs. Richards argued that the broad language of the release could cover an almost unlimited number of bizarre hypothetical situations and is therefore invalid. However, again, while the release will not be extended beyond those situations clearly contemplated by the parties, the rule of *Arnold* is that it will be applied to those situations clearly contemplated. The release clearly covers the situation in which the passenger is injured while riding in the truck, and this is precisely what happened to Mrs. Richards.

As to the third question, I agree with the court of appeals and conclude that it was clearly contemplated that the release obviously covered claims against the company based upon the spouse's negligent driving. *Richards v. Richards,* 173 Wis. 2d at 908, 1993 WL 8053 (Wis. App.), p. 2, (Unpublished Opinion).

Applying the rule of *Arnold,* the release should be enforced to the extent it covers situations clearly contemplated by the parties. I agree with the circuit court and court of appeals that Mrs. Richards clearly contemplated that the release would cover an injury sustained while Mrs. Richards was riding in the truck as a passenger during an accident caused by her husband's negligence, and that Monkem, at least, would be covered.

How and why the majority avoids the rule of *Arnold* is unclear. *Arnold* establishes that exculpatory

1032

clauses, while not favored, will be enforced to the extent they cover situations clearly contemplated by the parties executing the release. Accordingly, the fact that the release in *Arnold* was broad and ambiguous did not result in invalidation of the release. Instead, the court in *Arnold* remanded the summary judgment case to the circuit court to determine whether the specific accident which occurred was within the contemplation of the parties to the release.

The court in *Arnold* did *not* say that all questions of what was clearly contemplated must be returned to the circuit court when a release is broad in its terms. Quite to the contrary, the court explicitly noted that certain types of situations may reasonably be concluded were contemplated by the parties. The release in *Arnold* concerned the activity of racing. The court noted that "it would be reasonable to assume that this exculpatory contract was intended to preclude liability for such things as negligent maintenance of the track or the negligent driving of another driver participant . . .." *Arnold,* 111 Wis. 2d at 212. The court's only concern was that it was unclear whether "rescue operations" were to be covered. Nor did the court say that rescue operations could not be covered by a broad release; rather it held only that it was not clear whether that particular type of situation had been contemplated and remanded for a factual determination on that question.

Precisely the same analysis should be applied to the present case. Clearly the parties here must be held to have contemplated that the release would cover injuries sustained by Mrs. Richards while riding as a passenger during an accident caused by her husband's negligence. That much was clearly contemplated and should be enforced to that extent. Had Mrs. Richards

been injured in some other way, then we would have to confront whether that situation was clearly contemplated or not. But that is not our case. Thus regardless of how many hypotheticals are engaged to avoid *Arnold,* that case and the cases subsequent to *Arnold* still stand for the rule that exculpatory contracts will be enforced to the extent they cover situations clearly contemplated by the parties. Neither *Dobratz* nor any other decision has repealed that basic rule.

The majority cites *Dobratz* for the statement that "this court will not favor an exculpatory contract that is broad and general in its terms." I agree. However, *Dobratz* does *not* say that broad and general releases are invalid. Quite to the contrary, *Dobratz,* 161 Wis. 2d at 521, cites to *Arnold* and explicitly endorses the analysis and conclusion of *Arnold.*

Nor does *College Mobile Home Park & Sales* provide a legitimate basis to avoid the rule of *Arnold.* The majority claims that *College Mobile Home Park & Sales* is "more pertinent" to the present situation than is *Arnold.* 181 Wis. 2d at 1011. However, the majority does not explain how or why. *College Mobile Home Park & Sales* cannot be more "pertinent" than *Arnold,* neither in fact nor in law. On the facts, *College Mobile Home Park & Sales* concerns the specialized area of landlord-tenant law, an area now covered by statute. The release in *Arnold,* which is a condition of permission for a discretionary activity and which concerns injuries occurring while riding in a vehicle, is clearly more analogous to the present situation. Likewise, in the law, *Arnold* supersedes *College Mobile Home Park & Sales. Arnold* establishes the rule that broad exculpatory releases will be enforced to the extent they cover situations clearly contemplated by the parties. It refers to *College Mobile Home Park & Sales* as an example of

landlord-tenant law and cites that case and others as consistent with the rule promulgated in *Arnold.* Accordingly, *College Mobile Home Park & Sales* does not overrule or displace the rule established in *Arnold.*

The third reason given for invalidation of this release by law is that "the release is in a standardized agreement printed on the Company's form, offering little or no opportunity for negotiation or free and voluntary bargaining." 181 Wis. 2d at 1011. This "reason" is, of course, actually a combination of several factors, none of which supports a "rule" for invalidation by law.

First, the suggestion that there is something inherently or presumptively wrong with releases written in *standardized* forms is without foundation. There is plenty of authority that standardized contracts will be read strictly and will be construed against the drafter, etc. *see e.g. Restatement (Second) of Torts* § 496B, Comments C and D; *Restatement (Second) of Contracts* § 195, Comment B. However, there is no authority cited that a standardized form is inherently or even presumptively invalid in this context or any other. Again, this "rule," if it is to be that, appears for the first time in the majority opinion.

Such a rule, which would effectively ban standardized releases, also conflicts with prior case law. Many, if not all, of the cases in which releases have been enforced involve pre-printed and standardized forms. For instance, in *Arnold,* 111 Wis. 2d at 211, this court specifically commented on the standardized nature of the exculpatory contract in that case. Significantly, the court did *not* take issue with the fact that the form was standardized. The problem in *Arnold* was lack of clarity in the terms of the clause, not the fact that the form was standardized. There is nothing in *Arnold* to sug-

1035

gest that the standardized nature of the release was itself the source of reservations, much less that standardized agreements are somehow presumptively invalid.

Nor does the proposed rule against standardized forms have a practical purpose. The majority opinion explains that "[w]hile the Company had the time and resources to draft the provisions and plan their effect, the plaintiff did not." 181 Wis. 2d at 1007. I find no legal or practical reason why the company should not take the "time and resources to draft the provisions and plan their effect." We should hope that all drafters would use such circumspection. Is it seriously suggested that the release would be more acceptable had it been improvised hurriedly on a piece of blank paper? Would public policy be favored if the company could prove it gave no thought to the effect of the provisions or if it could prove it had incorrectly planned the effect of the provisions? Again, assuming that public policy is not otherwise violated, all that is required is that the release be clear. It will be enforced to the extent it covers what was clearly contemplated by the parties.

Second, the imposition of a "bargaining" requirement has no legal foundation in this context and makes little practical sense. It is true that the courts will sometimes compensate for the weaker bargaining power of certain actors in contract cases. However, these cases are typically limited to special situations and special areas of the law. For instance, as this court explains in *Arnold,* 111 Wis. 2d at 210:

> "There are a variety of other situations in which courts have refused to enforce exculpatory contracts on grounds of public policy. They include: excusing a party from tort liability for harm caused intentionally or recklessly; excusing an employer

from liability to an employee for injury in the course of his employment; relieving a party charged with performing a service of great importance to the public; and excusing a party invoking exculpation who possesses a decisive advantage in bargaining strength."

*Arnold* does include unequal bargaining strength as a factor. However, the source for this analysis is § 195 of the *Restatement (Second) of Contracts* which does not list unequal bargaining strength as an *independent* factor. Similarly, the *Restatement (Second) of Torts* § 496B, Comment J, also mentions the "disparity of bargaining power," but limits this factor to special contexts in which there are other factors involved, for instance, when there is no "free choice" on the part of the plaintiff owing to the "necessities" and "exigencies" of the situation.

No cases are cited—from any jurisdiction—which suggest that the mere fact that the parties to a contract possess unequal bargaining strength means that no exculpatory clauses or releases are permissible. When this court has applied the unequal bargaining strength rationale, as in *Discount Fabric House v. Wis. Tel. Co.,* 117 Wis. 2d 587, 345 N.W.2d 417 (1984), it rejected that view. In *Discount Fabric House,* the unequal bargaining factor was explicitly linked to (and limited to) the public service context of the situation:

> This exculpatory clause in this private contract is against public policy in that the parties are not on equal bargaining terms *and* the telephone company has created a public interest in the publication of the yellow pages which requires that the telephone company perform its private duty to the ad subscriber without negligence or be held for damages. (emphasis supplied). *Id.* 117 Wis. 2d at 600.

The court in *Discount Fabric House* emphasized the "indispensable" nature of the service:

> In publishing the yellow pages the telephone company is engaged in performing a service of great, if not essential, importance to the public and it holds itself out as willing to give *reasonable* public service to all who apply to place ads in the yellow pages. The telephone company possesses a decisive advantage of bargaining strength. *Id.* 117 Wis. 2d at 596.

Finally, the court in *Discount Fabric House,* 117 Wis. 2d at 600–601, cited with approval a case which expressed the rule as follows:

> There are then two inquiries in a case [involving unequal bargaining strength]: (1) What is the relative bargaining power of the parties, their relative economic strength, the alternative sources of supply, in a word what are their options?; *(2) Is the challenged term substantively reasonable? . . . Thus merely because the parties have different options or bargaining power, unequal or wholly out of proportion to each other, does not mean that the agreement of one of the parties to a term of a contract will not be enforced against him; if the term is substantively reasonable it will be enforced.* By like token, if the provision is substantively unreasonable, it may not be enforced without regard to the relative bargaining power of the contracting parties. (emphasis supplied).

Accordingly, then, none of these rationales applies to the present context. Monkem is not providing a public service or fulfilling a public duty in permitting Mrs. Richards to ride with her husband. Monkem is not entering a market transaction. Nor is this in any sense a "necessity" for Mrs. Richards. The majority opinion

laments that, "[i]f her plans to ride with her husband were to go forward, the plaintiff simply had to adhere to the terms of the written form." 181 Wis. 2d at 1019. However, the mere fact that she made "plans" to do something which was not authorized cannot by itself inject any requirement for "bargaining." Nor can the mere fact that one party sets a condition mean that unequal bargaining power has been employed. The company is under no obligation to allow any passengers. It is willing to entertain applications upon request, but only if the spouse-passengers sign releases of claims against the company for injuries they might sustain while being a passenger. Such a requirement is neither unfair nor surprising.

As such, this newly created "bargaining" requirement, if it be that, is issued without any ascertainable standards. The majority has failed to explain when or why the newly created bargaining requirement is to be applied and the opinion does not begin to explain how it is to be applied. Is it applied because of something Monkem has done? At one point the majority implies that the bargaining requirement is to be applied because the company "probably derives some benefit" from a situation. However, besides the fact that this is pure speculation (Mrs. Richards never claims this), is there any situation in which one could not speculate that one party or another "probably derives some benefit"? Clearly such a rule would know no boundaries. And, again, there is no law cited from any jurisdiction or source suggesting anything even close to a "rule" that just because someone "probably derives some benefit" that that party must "afford" the other party an "equal opportunity to negotiate."

Perhaps the newly created bargaining requirement is applied because of something Mrs. Richards

might have done—assuming she had read the release, of course. At one point the majority suggests that, "[h]ad the plaintiff been afforded the opportunity to negotiate a release, she might have declined to release the Company from liability for intentional or reckless actions . . ." 181 Wis. 2d at 1020. Ironically, however, such claims would not need to be "declined" because they are unenforceable anyway. There is already a rule against releasing claims for intentional or reckless actions. That rule is to decline enforcement in those instances, *not* to invalidate the release as a whole. If Mrs. Richards had been injured by defective equipment, then, we would have to address the question of whether that type of risk was clearly contemplated by the parties or not. However, the mere fact that one can think of some hypothetical which might not be covered does not mean that the release as a whole is invalid. Were that so, the rule in *Arnold* would have no meaning.

Both practitioner and court are left without a clue as to what it means to "afford" Mrs. Richards "the equal opportunity to negotiate a release." First, it is unclear when, why or how this "opportunity to negotiate" should be "afforded." Is the company to ask all spouse-applicants if they wish to negotiate? On the facts of the present case it makes little sense to say that Mrs. Richards was not "afforded" an "opportunity" when she failed to really read the release and never asked anyone at the company any questions about the release and did not even indicate any dissatisfaction with the release to the company. How and why can the majority imply that the company somehow failed to "afford" Mrs. Richards "opportunity" when she never requested any such "opportunity"?

Second, what does it mean to "negotiate" in this context, and how would the company ensure that the negotiations were "equal"? Are we to assess the competency of Mrs. Richards to negotiate and assume that any deficiencies must somehow be compensated for in substance by the company? What if Mrs. Richards is offered an entire brochure on negotiation skills but fails to read it, just as she failed to really read the one page release? Or is it suggested that the company appoint someone to help Mrs. Richards draft a counter-proposal? Must the company then negotiate—in good faith, of course—about which terms of its own release it might be willing to drop in "negotiations"? And what if, despite very skilled and fair negotiations on both sides, Mrs. Richards nevertheless agrees to accept the full release. The majority opinion implies that this result would be presumptively suspect. . . . The questions and problems these new "rules" raise are without visible end or solution.

Third, I disagree with majority's comments about the cover letter and the employee handbook. The majority opinion does not claim that the cover letter or the employee (student) handbook were in any way affirmatively misleading. However, the majority opinion does suggest that one or both of these materials extraneous to the release should have explained the release to Mrs. Richards *by law*. The majority opinion states that the "cover letter did not advise [Mrs. Richards] that the document was a release of all claims and did not advise her of the legal significance attached to her signing of the document." 181 Wis. 2d at 1019. Likewise, the majority opinion complains that the "employee handbook advised employees that Company authorization was needed for a passenger to ride along but did not advise employees that the passenger would

have to release all claims against the Company." 181 Wis. 2d at 1019.

Thus, as written, the majority opinion implies that an otherwise clear *standardized* clause would require *non-standardized* extraneous matter to explain the contents and effect of the clause. That is not the law. The cover letter and employee handbook are extraneous to the release. As such, they are relevant only to the extent they could either clarify or confuse the original release. If the release is itself clear, then, there might be a question of whether the cover letter or employee handbook, when read together with the clause, made the release unclear. However, on the facts of this case, both the cover letter and the handbook were neutral and factually accurate.[4] There is no law that a cover letter which accompanies a release must reemphasize that the document it accompanies is a release when the document itself makes that clear. Nor is there any requirement that a cover letter explain the "legal significance" of the document it accompanies when the document itself is clear. Finally, there is no reason that the employee handbook must assume this responsibility, especially since it was not presented to Mrs. Richards, and she did not read it carefully, if at all. Thus, so long as these extraneous materials do not

---

[4] The cover letter was addressed to Mrs. Jerilyn Richards and read as follows: "Both of you should sign where indicated on the attached form. Please return the yellow copy in the enclosed envelope to this office and keep the original on the truck with you at all times. If you have any questions, please contact us." The entry in the employee handbook was merely stating that a passenger authorization was possible. It described the eligibility requirements and made clear that the process of applying would be handled through the Director of Risk Management of the company.

detract from the release, then the release stands on its own.

Finally, the majority opinion attempts to characterize this result as necessary to "accommodate" the "tension between the principles of contract and tort law" which is inherent in exculpatory agreements. 181 Wis. 2d at 1016. The principle of tort law "prevails" in this instance, the majority opinion explains, because we should "impos[e] liability on persons whose conduct *creates* an unreasonable risk of harm." (emphasis supplied) 181 Wis. 2d at 1015. However, in the present context, it is not Monkem who "creates" an unreasonable risk of harm, but rather it is Mrs. Richards who brought the risk into being by requesting authorization to be a passenger in the truck, and it was Mrs. Richards' husband who caused the accident through his own negligence.[5] Monkem company was only attempting to protect itself from claims in which a passenger-spouse sues the employer-owner on the basis of the spouse-driver's negligence. Since allowing passengers is entirely within the discretion of the company and is not favored generally by Federal law (hence the authorization requirement), it surely is not against public policy for a company in Monkem's position to demand a release of claims related to being a passenger before it gives authorization for the spouse-passenger to accompany the spouse-driver. Afterall, Monkem was

---

[5] It was noted in *Discount Fabric House,* 117 Wis. 2d at 600, that exculpatory clauses are not favored because "such provisions tend to induce a want of care . . ." However, in this instance, there is no hint, no allegation, and certainly no showing, that Monkem Company's level of care diminished in connection with the release or otherwise. Nor would there be any incentive to reduce the level of care because the company would still be liable to all others, and to the driver, in particular.

doing Mr. & Mrs. Richards a favor by granting permission for Mrs. Richards to accompany her husband in the truck.

The sweeping condemnation of this release by the majority opinion, however, coupled with the refusal to enforce even those aspects of the release which were "obvious" to even Mrs. Richards, leaves companies such as Monkem clueless as to how one might craft a valid release. After reading the majority opinion, one might conclude that a valid release may be executed only if the document is not standardized, only if the company has not planned the effect of the document, only if the document says "RELEASE" more than once in each paragraph, only if a copy of the release and an explanation of the release are included in all correspondence to the prospective signatory and in all other materials such as student handbooks which might fall into the hands of a prospective spouse-passenger applicant, and, finally, only if the company provides for real and effective "bargaining" for spouse-passenger applicants.

Because the majority opinion ignores our past precedents and creates new "rules" that are in my opinion unnecessary and unwise, I dissent.

I am authorized to state that JUSTICES STEINMETZ and WILCOX join in this dissenting opinion.