Kip TRAINOR, Plaintiff-Appellant,

v.

AZTALAN CYCLE CLUB, INC., American
Motorcyclist Association, First State Insurance
Company, Lexington Insurance Company, and
Dane County, Defendants-Respondents.†

Court of Appeals

*No. 87–1841. Argued July 21, 1988.—Decided October 13, 1988.*

(Also reported in 432 N.W.2d 626.)

† Petition to review denied.

For the plaintiff-appellant there were briefs by *John A. Becker* and *Hanson, Gasiorkiewicz & Becker, S.C.,* of Racine, and oral argument by *John A. Becker.*

For the defendants-respondents there was a brief by *Thomas J. Arenz, Charles H. Bohl, W. Timothy Steinle,* and *Frisch, Dudek and Slattery, Ltd.,* of Milwaukee, and oral argument by *Thomas J. Arenz.*

Before Gartzke, P.J., Dykman and Eich, JJ.

EICH, J.  Kip Trainor, a motorcycle racer, was injured while participating in a "motocross" race sponsored by the respondents, Aztalan Cycle Club, Inc., and the American Motorcycle Association (AMA). He sued the club and the association (and their insurers) for damages, alleging that they were negligent in maintaining the racecourse. Aztalan and AMA moved for summary judgment dismissing the

action on grounds that Trainor had executed releases prior to the race which relieved the race sponsors from any and all liability for negligence. The trial court granted the motion and Trainor appealed, claiming: (1) that the exculpatory agreement cannot release the sponsors' "gross" or "active" negligence; and (2) even if the agreements were valid against the club and the association, they did not release their insurers. We resolve both issues against Trainor and affirm the judgment.

The procedure used by both trial and appellate courts to determine motions for summary judgment is well-known and well-documented, *State Bank of La Crosse v. Elsen,* 128 Wis. 2d 508, 511–12, 383 N.W.2d 916, 917–18 (Ct. App. 1986), and we need not discuss its elements in detail. Applying that procedure to Trainor's case, we note first that his complaint states a cause of action for negligence against Aztalan and AMA. It alleges that both were negligent in maintaining the racecourse and in running the race on a track known to them to be dangerous to riders. We also believe the answer joins the issues, for it denies any negligence on Aztalan's or AMA's part and raises the releases as a defense to liability. We next look to the moving parties' affidavits to see whether they state a *prima facie* defense to the action.

The primary affidavit filed in support of Aztalan's and AMA's motions for summary judgment was a compilation of Trainor's deposition testimony which revealed the following facts. Trainor was an experienced motocross motorcycle racer. Motocross is an event in which motorcycles are driven over a hilly, curving dirt track containing several "jumps" that send motorcycles and riders flying through the air. According to Trainor, the racers' objective is to get

around the track "as fast as you [can] without falling." He acknowledged that the sport carries a risk of injury. Indeed, Trainor himself had fallen nearly 100 times in his three-year racing career, sometimes suffering injuries in the process. Trainor was aware of the fact that the Aztalan track was "one of the most dangerous" in his experience. He also acknowledged that he was prepared to accept the risks of motocross racing—including the "possibility" of serious injury— because of his confidence in his skill as a racer.

Aztalan and AMA encouraged riders to personally inspect the track prior to the race, and Trainor did so. He thought that one or more of the "double jumps" were too steep and conveyed his feelings to one of Aztalan's officers. The officer replied, "Well, that's motocross," and declined to alter the course.

Trainor decided to race anyway and signed two releases, one for Aztalan and one for AMA. In the former, Trainor agreed to release and discharge Aztalan (and any cosponsor) "from any and all claims, actions, suits ... and demands of any nature ... arising from ... any accident, collision or other occurrence during or in connection with the operation of this event ... or in connection with the condition of the premises on which this event takes place." The document also acknowledged that Trainor had inspected the racecourse and that, in entering the race, he was "rel[ying] upon his own inspection and his own skill, judgment, and ability and not upon such safety precautions as may be taken by [the sponsors]." Finally, it provided that Trainor "assume[d] all risks of ... injury ... while upon the premises." The AMA release contains language of similar import.

Trainor had signed many such releases in his racing career, and he testified that he never read any

110

of them before signing them—including the Aztalan and AMA releases for the race in which he was injured. He stated that he was aware that the purpose of the releases was to "keep [him] from suing" the race sponsors, but he assumed that if he were to be seriously injured in a race, he would still be able to "get some money out of Aztalan['s] insurance company."

We are satisfied that these facts establish a *prima facie* defense to Trainor's action. A *prima facie* case is made when "the affidavits supporting the motion ... state evidentiary facts which, unless controverted, would resolve all factual issues in the [moving party's] favor." *Staples v. Young,* 142 Wis. 2d 194, 204, 418 N.W.2d 329, 332–33 (Ct. App. 1987), *petition for review granted.* Aztalan's and AMA's affidavits do just that, for they establish that Trainor, knowing the condition of the track from his own inspection, signed releases absolving the race sponsors from any and all liability for injuries occurring in the race. We next look to the opposing party's affidavits to see whether they raise disputed issues of material fact. If they do, the procedure ends and the motion must be denied. If they do not, we proceed to decide the legal issues presented by the motion.

In opposition to the motions, Trainor filed his own affidavits, additional excerpts from his deposition testimony, and portions of a deposition of William Sheppard, Aztalan's president. Sheppard stated that Trainor had come to him before the race with a complaint that "some jumps were too peaking." Sheppard told Trainor that in his opinion the track was safe, and he stated that neither he nor anyone else made any alterations to the track prior to the race.

Trainor testified in his deposition that he felt the "double jumps" were "too high," "too peaked off," and "too steep," and that he told Sheppard: "It sucks. The bumps are too peaked off .... Somebody is going to get hurt." Finally, Trainor's affidavit acknowledges that he never read the releases before signing them, but that he "always understood that if an accident occurred, ... one ... of the [sponsors] would have insurance to cover any injuries sustained."

The following day Trainor was injured during a pre-race practice lap when he fell going through one of the "double jumps," and this action followed. Trainor does not contend that the parties' affidavits raise any disputed factual issues, and we agree. Trainor concedes that he inspected the track, signed the releases and participated in the race, and Aztalan and AMA agree that they made no effort to alter the track surface after Trainor complained to them that the jumps were dangerous. The appeal concerns a single legal issue—the efficacy of the releases as to Aztalan, AMA and their insurers.

The essence of Trainor's argument is: (1) that Aztalan and AMA were negligent in failing to inspect and maintain the track and in sponsoring an event on a dangerous track; and (2) that such conduct constitutes "gross negligence and ... a wilful and reckless disregard of [his] rights ...." Trainor acknowledges that "gross negligence" was abolished by the Wisconsin Supreme Court nearly thirty years ago. He maintains, however, that the "concept ... still applies" in certain areas—such as punitive damages—and he asks us to apply it here to defeat the releases. His argument is that because the releases seek to excuse what he defines as gross negligence—that is, acts which evidence "either a wilful intent to injur[e], or

112

reckless and wanton disregard of the rights and safety of another person"—they are void as a matter of law on grounds of public policy. He cites three cases for the proposition: *Discount Fabric House v. Wis. Tel. Co.,* 117 Wis. 2d 587, 595, 345 N.W.2d 417, 421 (1984); *Arnold v. Shawano County Agr. Society,* 111 Wis. 2d 203, 209, 330 N.W.2d 773, 777 (1983); and *Merten v. Nathan,* 108 Wis. 2d 205, 212–13, 321 N.W.2d 173, 177–78 (1982).

*Discount Fabric House* and *Merten* both contain lengthy quotations from Restatement (Second) of Contracts, sec. 195 (1979), discussing various types of exculpatory contracts which courts have sometimes voided on public policy grounds. Examples include contracts exempting an employer from responsibility for employee injuries incurred in the course of employment, exempting one charged with a duty of public service from liability for breach of that duty, and exempting a party from liability for "harm caused intentionally or recklessly." *Discount Fabric House,* 117 Wis. 2d at 595, 345 N.W.2d at 421; *Merten,* 108 Wis. 2d at 212, 321 N.W.2d at 177. *Arnold* does no more than briefly summarize the Restatement discussion. *Id.,* 111 Wis. 2d at 210–11, 330 N.W.2d at 777. It is the latter "rule" that Trainor advances in this case—that "a [contract] exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy." None of the three cited cases applied that rule, however.

In *Discount Fabric House,* a contract relieving the telephone company of the consequences of its negligence in preparing business telephone listings was invalidated not because the company's negligence was "gross," but because, in the court's view, publication of telephone listings is affected with a public interest,

and, in addition, the parties were "not on equal bargaining terms." *Id.,* 117 Wis. 2d at 600, 345 N.W.2d at 423. And in *Merten,* the court specifically noted that the contract in question did not fit *any* of the Restatement categories but, rather, was sought to be invalidated because it contained a false statement. *Merten,* 108 Wis. 2d at 213, 321 N.W.2d at 178.

*Arnold* also involved injuries to a race participant, although the facts were rather unusual. There, the plaintiff, a stock car racer, sustained severe brain damage when, after a crash, racetrack personnel sprayed chemicals into his burning car, causing a chemical reaction that made the fumes extremely toxic. The court briefly referred to the Restatement, and concluded that none of the "public policy" exceptions applied to the case. *Arnold,* 111 Wis. 2d at 210–11, 330 N.W.2d at 777. Then, recognizing that exculpatory contracts should be "closely scrutinize[d]," *id.* at 209, 330 N.W.2d at 777, the *Arnold* court noted that they are nonetheless held to be generally valid and enforceable as to "things within the contemplation of the parties at the time of execution of the release." *Id.* at 212, 330 N.W.2d at 778, quoting *Plummer v. Leonhard,* 44 Wis. 2d 686, 692, 172 N.W.2d 1, 4 (1969). The court went on to state:

> [T]his court is not willing to say that exculpatory contracts for race car drivers are always invalid for any injury; however, they will be strictly scrutinized. We therefore require that the contract clearly express the intent of the parties so that with the surrounding circumstances, it is clear the parties knowingly agreed to excuse one of them from otherwise responsible acts. *Arnold,* 111 Wis. 2d at 213, 330 N.W.2d at 779.

Because the *Arnold* court felt there was a question of fact as to whether the contract—which the court assumed "was intended to preclude liability for such things as negligent maintenance of the track"—also included the risk of negligent rescue operations, it ruled that summary judgment was an inappropriate means to resolve the case and sent it back for trial. *Id.,* 111 Wis. 2d at 212, 330 N.W.2d at 778.

Despite the citations, then, Trainor has not pointed to any Wisconsin cases invalidating exculpatory contracts on what he calls "gross negligence" grounds. While the supreme court has, on several occasions, quoted passages from the Restatement which include the statement that such contracts are invalid to the extent they attempt to excuse intentional or reckless conduct, it has not applied that rule to racecar drivers—or to anyone else, for that matter. Even so, there is no claim here—nor, on this record, could there be one—that Trainor's injuries were intentionally caused by Aztalan or AMA. Moreover, we are satisfied that, as a matter of law, neither sponsor's conduct may be considered "wanton" or "reckless." All that is claimed here, and all that is shown by Trainor's affidavits, is that Aztalan's president, when informed that one of the racers felt two of the jumps were too steep, did not take any steps to change the racecourse, leaving it to the racer himself to decide whether he still wanted to join the race—which, of course, he did, signing the release forms and participating in the event.

On those facts, Aztalan's conduct is a far cry from (using Trainor's own definition) "conduct which shows either a wilful intent to injur[e], or reckless and wanton disregard of the rights and safety of another person . . . ." Trainor himself described the race as one

in which the riders attempt to run the course at the highest possible speed consistent with their ability to control their motorcycles—to "find that specific point in which you were approaching a hundred percent of your skill level ... [so] you could go as fast as you possibly could without falling ...." And the nature of the jumps and the overall topography of the track all enter into the equation. We believe that the court's analysis of motorcycle racing in *Hammer v. Road America, Inc.*, 614 F. Supp. 467, 470 (E.D. Wis. 1985), *aff'd*, 793 F.2d 1296 (7th Cir. 1986), is equally applicable here:

> It is important to note here that [the plaintiff] was injured while negotiating a turn—the touchstone of the sport of racing. The most exciting part of any race ... is the turn, and the sharper the better. That's why the thrills of sports from cycle racing to bobsledding are intensified in direct proportion to the "danger" of the curve.
>
> The object of the race is to cover the distance as fast as possible. Certainly, a racer will increase his [or her] safety if he [or she] slows down in the turn. A racer, however, will try, if he [or she] wants to do well, to take the turn as fast as he [or she] can without losing control of his [or her] cycle. The closer he [or she] gets to the danger point the better will be his [or her] performance, but the greater will be his [or her] risk. Therein lies the allure of racing.

Substitute "double jump" for "curve," and the district court's discussion closely tracks Trainor's own description of the sport of motocross racing and his participation in it. It is a sport, like many others—primarily racing sports—where both the participants' success and the spectators' enjoyment depend upon

the degree to which the racers can perform "at the edge." Under the circumstances of this case, we are satisfied that Aztalan's refusal to alter the racecourse after being told by Trainor that, in his opinion, the jumps were too steep, was not the type of wanton or reckless conduct to which the Restatement comments would apply.

The question is, then, whether the accident and Trainor's resulting injuries may be said to constitute the type of occurrences contemplated by the releases. For many of the same reasons discussed above, we believe they were. Aztalan's release covered all claims arising from "any accident ... or other occurrence during or in connection with" the race, or "in connection with the condition of the premises on which [the race] takes place." AMA's release covered any claims "in any way resulting from, or arising in connection with [the race] ...."

This is not a case, like *Arnold,* where, because of the unusual nature of the events giving rise to the injury (the toxic effect of a chemical reaction instigated by fire-extinguishing chemicals sprayed into the plaintiff's burning car during post-collision rescue attempts), the court could not determine whether the specific language of the release applied. Here, Trainor was injured when he fell during a race, and there is no question that this was an occurrence contemplated by the plain language of the releases—language which evinces the parties' intent to relieve the race sponsors from liability for injuries to drivers resulting from accidents occurring during a race. And we note that our decision in this regard is consistent with a large and growing number of cases in other jurisdictions

117

upholding exculpatory contracts in "sporting event" situations.[1]

We hold, therefore, that because Trainor's claim arose out of an occurrence within the contemplation of the parties at the time the releases were executed, the trial court correctly granted Aztalan's and AMA's motions for summary judgment.[2]

[1]*See, e.g., Gore v. Tri-County Raceway, Inc.,* 407 F. Supp. 489 (M.D. Ala. 1974) (automobile race); *Valley Nat. Bk. v. Stock Car Auto Racing,* 736 P.2d 1186 (Ariz. Ct. App. 1987) (automobile race); *Coates v. Newhall Land & Farming, Inc.,* 236 Cal. Rptr. 181 (Cal. App. 1987) (motorcycle race); *Hulsey v. Elsinore Parachute Center,* 214 Cal. Rptr. 194 (Cal. App. 1985) (parachute jumping); *Doster v. C.V. Nalley, Inc.,* 99 S.E.2d 432 (Ga. Ct. App. 1957) (automobile race); *Lee v. Sun Valley Co.,* 695 P.2d 361 (Idaho 1984) (horseback riding); *Lohman v. Morris,* 497 N.E.2d 143 (Ill. App. Ct. 1986) (automobile race); *Winterstein v. Wilcom,* 293 A.2d 821 (Md. Ct. Spec. App. 1972) (automobile race); *Lee v. Allied Sports Associates, Inc.,* 209 N.E.2d 329 (Mass. 1965) (automobile race); *Malecha v. St. Croix Valley Skydiving Club,* 392 N.W.2d 727 (Minn. Ct. App. 1986) (skydiving); *Barnes v. New Hampshire Karting Ass'n, Inc.,* 509 A.2d 151 (N.H. 1986) (kart racing); *Theroux v. Kedenburg Racing Association,* 269 N.Y.S.2d 789 (1965), *aff'd,* 282 N.Y.S.2d 930 (1967) (automobile race); *Cain v. Cleveland Parachute Training Center,* 457 N.E.2d 1185 (Ohio Ct. App. 1983) (parachute jumping); *Huckaby v. Confederate Motor Speedway, Inc.,* 281 S.E.2d 223 (S.C. 1981) (automobile race); *Corpus Christi Speedway v. Morton,* 279 S.W.2d 903 (Tex. Civ. App. 1955) (automobile race); *Conradt v. Four Star Promotions, Inc.,* 728 P.2d 617 (Wash. Ct. App. 1986) (automobile race).

[2]Trainor also poses an alternative argument: because Aztalan's claimed negligence is "active," rather than "passive," it cannot be excused by an exculpatory agreement. He bases the argument on *State Farm Fire & Casualty Co. v. Home Ins. Co.,* 88 Wis. 2d 124, 276 N.W.2d 349 (Ct. App. 1979). *State Farm,* however, considered the "active/passive" distinction solely in terms of the landlord-tenant relationship. It is a distinction the supreme court

Finally, Trainor contends that, even if the releases are held to bar his action against Aztalan and AMA, they do not bar a direct action against their insurers. In so arguing, he relies primarily on the "direct action statute," sec. 632.24, Stats., which provides that an insurer is directly liable "to the persons entitled to recover against the insured for ... injury to persons or property," and on the following statement in *Loy v. Bunderson,* 107 Wis. 2d 400, 426, 320 N.W.2d 175, 189 (1982):

> An insurer is directly liable to the plaintiff if the underlying conditions of negligence are satisfied although, after commencement of the action, the insured is released or protected by an absolute covenant not to sue. The responsibility of an insurance company to an injured party is derivative of the insured's conduct, but it is not derivative of the status of the insured's personal liability to a plaintiff at the time the insurer's contractual obligations are triggered by a judgment for damages.

Considering the fact of *Loy,* however, and the policy factors underlying the court's decision in that case, we do not consider it to be at all persuasive on the issue.

As the quoted sentences suggest, *Loy* had nothing to do with a before-the-fact release such as those signed by Trainor in this case. In *Loy,* the plaintiff was injured in an automobile accident and later commenced an action against two other drivers and their

has, over the years, "showed little enthusiasm for," *Pachowitz v. Milwaukee & S. Transport Corp.,* 56 Wis. 2d 383, 388, 202 N.W.2d 268, 271 (1972), and we decline Trainor's invitation to extend it to exculpatory contracts between motorcycle race sponsors and motorcycle racers.

119

insurers. The case was settled after lengthy pretrial negotiations, and the terms of the release given by the plaintiff mentioned only the insureds, not the insurers. In ruling that the insurers were not covered by the release, the court relied heavily on a New Jersey case, *Christina Deblon v. Leslie Beaton and Jersey Ins. Co.*, 247 A.2d 172 (N.J. Super. 1968), which held that "a release given by plaintiff *upon settlement* with the primary liability insurer without prejudice to the rights against an excess insurer does not preclude further recovery against the excess insurer." *Loy,* 107 Wis. 2d at 424, 320 N.W.2d at 188 (emphasis added). According to the *Loy* court, its ruling that the insured's release did not affect the insurers advanced the public policy of giving injured persons access to the responsible party's liability insurance, and encouraging settlement of lawsuits by permitting plaintiffs "to settle claims against some of *the exposed parties* without releasing others." *Id.* at 424–25, 320 N.W.2d at 189 (emphasis added).

The emphasized words in the quoted language, and the court's public policy pronouncements, indicate quite strongly, we feel, that the *Loy* rationale is based on post-accident "settlements" with parties "exposed to liability" for the plaintiff's injuries. In this case, however, the releases were not negotiated "to settle [any] claims" against parties "exposed" to liability for Trainor's damages. They were simply the standard release required as a precondition to participation in the concededly dangerous sport of motorcycle racing. Nor were there any claims in existence, or any parties exposed to liability, at the time Trainor signed the documents. The question is not, as it was in *Loy,* whether Trainor could pursue a direct action against the insurers after settling his claims against

Aztalan and AMA. He never had any claims in the first place as a result of the releases.

The *Loy* court recognized this distinction when it pointed out that the direct action statute imposes direct liability on the insurer only "if other factors trigger insurance company liability," and noted that the cases cited by the insurance company in that case were inapposite because they involved situations "in which there is no underlying liability whatsoever." *Id.,* 107 Wis. 2d at 421–22, 320 N.W.2d at 187. The court went on to state:

> Obviously, it is the nature of the insured's conduct and its consequences with which an insurance company is concerned. If there is no liability *ab initio* or there can be no liability, there is no responsibility under the [direct action] contract. To use the words of *Wiechmann v. Huber,* 211 Wis. 333, 336, 248 N.W. 112 [, 113] (1933):
>
> "It is quite impossible to read into the statutes an intent to create a liability on the part of the insurance carrier *completely* dissociated from the liability of the insured." (Emphasis the *Loy* court's.) *Loy,* 107 Wis. 2d at 422, 320 N.W.2d at 187.

That is the case here. Neither Aztalan nor AMA had any liability *ab initio* for Trainor's injuries, for he agreed before-the-fact to hold them harmless for any accident or injuries that might befall him in the next day's race. Because of this agreement, there could be no liability on the part of Aztalan or AMA for any injuries Trainor might suffer. Consequently, were we to hold the insurers responsible we would be "creat[ing] a liability" that is "completely dissociated" from their insureds' liability (or lack of it), and, under *Loy,* this we may not do.

Such a result is consistent with the direct action statute itself and the cases decided under it. The statute makes an insurer liable to "persons entitled to recover against the insured" and, as we have just noted, Trainor, by reason of his release, was never entitled to recover against Aztalan or AMA, *See also Kranzush v. Badger State Mut. Cas. Co.,* 103 Wis. 2d 56, 75, 307 N.W.2d 256, 266 (1981) ("[I]t is clear from the language of the statute that the liability to which the insurer is exposed is predicated upon the liability of the insured."); *Tierney v. Lacenski,* 114 Wis. 2d 298, 304, 338 N.W.2d 522, 525 (Ct. App. 1983) ("Under this section, the claimant has a right of action against the insurer only to the extent that he has the same right of action against the insured for his [or her] negligence."). We conclude, therefore, that the releases executed by Trainor for Aztalan and AMA also released their insurers.

*By the Court.*—Judgment affirmed.