Randall ROSE and Susan L. Rose, Husband and Wife and as Parents and Natural Guardians of Eric R. Rose, Nicholas Rose, and Emily Rose, minors, Plaintiffs,

and

Medica Choice Health Plan, Intervenor,

v.

NATIONAL TRACTOR PULLERS ASSOCIATION, INC., World Pulling International, Inc., K & K Insurance Co., and TIG Insurance Co., Defendants.

No. 98-C-041-C.

United States District Court, W.D. Wisconsin.

Dec. 31, 1998.

Stephen J. Foley, Foley & Mansfield, P.L.L.P., Minneapolis, MN, for Randall H. Rose, Susan L. Rose, Eric R. Rose, Nicholas Rose, Emily Rose.

Donald P. O'Meara, Baxter, O'Meara & Mathie, S.C., Milwaukee, WI, for Medica Choice Health Plan.

Pamela M. Schmidt, Whyte Hirschboeck Dudek, S.C., Milwaukee, WI, for National Tractor Pullers Assoc., World Pulling International Inc., K & K Insurance Company, TIG Insurance Company.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for money damages arising from an accident at a tractor pull competition in Tomah, Wisconsin. During this competition, plaintiff Randall Rose sustained serious injuries after his tractor, an 1,800 horsepower, turbo-charged behemoth, rolled over on top of him. Rose, his wife and children have sued the organizations responsible for setting the standards that govern tractor pull competitions, defendants National Tractor Pullers Association, Inc. and World Pulling International, Inc. In essence, plaintiff alleges that defendants should have alerted competitors to the hazards associated with rollovers and of competing while riding a tractor not equipped with some sort of roll bar protection system. This court has jurisdiction over plaintiffs' state law claims of strict liability, negligence, loss of consortium and negligent infliction of emotional distress under the diversity of citizenship statute. 28 U.S.C. § 1332.

The case is before the court on defendants' motion for summary judgment and plaintiffs' motion for partial summary judgment. Both motions turn on the validity of a contract signed by plaintiff Randall Rose absolving defendants of liability arising from injuries sustained as a result of the competition. Plaintiffs maintain that the contract is not enforceable for three reasons: 1) it is overbroad and ambiguous; 2) defendants engaged in reckless conduct, which cannot be waived by an exculpatory contract; and 3) plaintiff Randall Rose signed the contract in reliance upon misrepresentations made by defendants regarding the safety of tractor pulling. (Unless otherwise noted, all further references to "plaintiff" are to Randall Rose.)

I conclude that the exculpatory contract is enforceable. The contract clearly, unambiguously, and unmistakably informed plaintiff that he was absolving defendants of any liability arising from the competition, including injury resulting from defendants' negligent conduct. Looked at in its entirety, the contract alerted plaintiff to the nature and significance of what he was waiving. Plaintiffs have failed to show that defendants engaged in reckless conduct; there is no evidence that would permit the drawing of an inference that defendants acted in a manner so unreasonably dangerous that would support the drawing of the additional inference that they knew or should have known that it was highly probable that competitors would be harmed. Finally, plaintiffs have not established that defendants made any misrepresentations regarding the safety of tractor pulling that would have affected a reasonable person's decision to participate in the sport or to sign an exculpatory contract. Defendants' motion for summary judgment will be granted and plaintiffs' motion will be denied.

On a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Oates v. Discovery Zone, 116 F.3d 1161, 1165 (7th Cir.1997). For the purpose of deciding these motions for summary judgment, I find from the parties' proposed findings of fact that there is no genuine dispute with respect to the following material facts.

## UNDISPUTED FACTS

Plaintiffs Randall H. and Susan L. Rose are husband and wife; they live in Glencoe, Minnesota, with their children Eric, Nicholas and Emily. Defendant National Tractor Pullers Association, Inc., a corporation with offices in Worthington, Ohio, is in the business of sanctioning tractor pulls throughout the country. It was formed in 1969 to consolidate rules and regulations regarding the sport of tractor pulling. Defendant National Tractor consists of various "member states," each of which elects two delegates to represent the member state on defendant's full board. The full board then elects an executive board.

Through member states, competitors can recommend rule changes or raise other issues of concern with the board. The executive board has final authority to invoke, create or pass a new safety rule even if the full board, member states or individual pullers object to the proposed new rule. Defendant's rule book has evolved into a standard in tractor pulling and is respected by other pulling organizations as providing guidance to the sport.

Defendant World Pulling International, Inc., is a corporation with offices in Worthington, Ohio. It is the business arm of defendant National Tractor. TIG Insurance Company issued defendant National Tractor and defendant World Pulling a policy of liability insurance that may provide coverage for some or all of plaintiffs's claims. K & K Insurance Company is TIG's managing agent.

The object of tractor pulling is to pull a "sled" on a relatively flat, smooth surface for 300 feet. Generally, once the tractor starts pulling, a weight on the sled moves from the rear of the sled to the front, causing the front end of the sled to dig into the ground, increasing the drag on the tractor. Eventually the force of the sled's drag overcomes the pulling ability of the tractor and the tractor comes to a stop. An individual, known as the sled operator, rides on the sled and has access to a kill switch that will cut off the tractor's engine if he thinks that the tractor driver is in trouble.

Like all sports, tractor pulling contains certain risks. If a tractor experiences a mechanical failure or malfunction, it would be nearly impossible to predict the consequences of that failure. Defendant National Tractor has developed its rule book in an effort to minimize the risks associated with tractor pulling.

Plaintiff Randall Rose was familiar with tractors and tractor pulling. In fact, he did not think that defendants had any more knowledge about pulling than he did. Plaintiff has been driving tractors for more than

30 years, beginning with agricultural models when he was ten or eleven years old. As an adult tractor enthusiast, he belonged to defendant National Tractor and had competed in a number of tractor pulls. In addition, he promoted pulls and sat on the board of United Pullers of Minnesota between 1994—1997. Plaintiff competed for fun and excitement, not for monetary reward.

On June 27, 1997, plaintiff competed in the "Super Stock Division" at a tractor pull sanctioned by defendants, held at the Monroe County Fairgrounds in Tomah, Wisconsin. Plaintiff had designed, modified and assembled his tractor, "Deer Slayer." Under the hood, Deer Slayer boasted a 1,600 to 1,800 horsepower engine with four turbo chargers. Despite these impressive attributes, Deer Slayer had humble origins as a 150–horse powered agricultural model. Shortly after plaintiff began his run at the Tomah competition, he heard the engine "miss" and then his tractor rolled over. Exactly what caused the tractor to roll over is uncertain. As a result of the accident, plaintiff sustained severe injuries.

Before the competition, plaintiff had signed the following liability waiver without first reading it:

**RELEASE AND WAIVER OF LIABILITY AND INDEMNITY AGREEMENT**
VALID FOR NTPA EVENTS ONLY

*Super National tractor pull*

DESCRIPTION AND LOCATION OF ACTIVITY OR EVENT DATE RELEASE SIGNED

IN CONSIDERATION of being permitted to enter for any purpose and RESTRICTED AREA (herein defined as the areas to which admission by general public spectators is prohibited), or being permitted compete, officiate, observe, work for, or for any purpose participate in any way in the event, EACH OF THE UNDERSIGNED, for himself, his personal representatives, heirs, and next of kin, acknowledges, agrees and represents that he has, or will immediately upon entered any of such restricted areas, and will continuously thereafter, inspect such restricted area or areas and all portions thereof which he enters and with which he comes in contact, and he does further warrant that his entry upon such restricted area or areas and his participation, if any, in the event constitutes an acknowledgement that he has inspected such restricted area and that he finds and accepts the same as bing safe and reasonably suited for the purposes of his use, and he further agrees and warrants that if, at any time, he is in or about restricted areas and he feels anything to be unsafe, he will immediately advise the officials of such and will leave the restricted area(s):

1. HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE NATIONAL TRACTOR PULLERS ASSOCIATION, INC., the promoters, other participants, operators, officials, any persons in any restricted area, sponsors, advertisers, owners and lessees of premises used to conduct the event and each of them, their officers and employees, all for the purposes herein referred to as "releasees", from all liability to the undersigned, his personal representatives, assigns, heirs, and next of kin for any and all loss or damage, and any claim or demands therefor on account of injury to the person or property or resulting in death of the undersigned, whether caused by the negligence of the releases or otherwise while the undersigned is in or upon the restricted area, and/or, competing, officiating in, observing, working for, or for any purpose participating in the event.

2. HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS the releasees and each of the from any loss, liability, damage, or cost they may incur due to the presence of the undersigned in or upon the restricted area or in any way competing, officiating, observing, or working for, or for any purpose participating in the event and whether caused by the negligence of the releasees or otherwise.

3. HEREBY ASSUMES FULL RESPONSIBILITY FOR AND RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE due to the negligence of releasees or otherwise while in or upon the restricted area and or while competing, officiating, observing or working for or for any purpose participating in the event.

EACH OF THE UNDERSIGNED expressly acknowledges and agrees that the activities could be dangerous and involve the risk of serious injury and/or death and/or property damage. EACH OF THE UNDERSIGNED further expressly agrees that the foregoing release, waiver, and indemnity agreement is intended to be as broad and inclusive as is permitted by the law of the Province or State in which the event is conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full force and effect.

THE UNDERSIGNED HAS READ AND VOLUNTARILY SIGNS THE RELEASE AND WAIVER OF LIABILITY AND INDEMNITY AGREEMENT, and further agrees that no oral representations, statements or inducements apart from the foregoing written agreement have been made.

| SIGNATURE | STATUS | SIGNATURE | STATUS |
|---|---|---|---|

SIGNATURE & TITLE OF WITNESS ADDRESS

CL 52 7-88

If plaintiff had wanted to read the release before the competition in Tomah, he could have done so. He knew that at least once a year a copy of the release agreement ran in *Puller* magazine, a publication put out by defendants in connection with their membership solicitation process. Plaintiff never informed defendants that he had any problem with this release or with any of the other 28 releases he signed before the date of his accident. He did not try to negotiate any terms of the releases and he did not consult with any of defendants' officials about the meaning or effect of the signed releases. Plaintiffs Susan and Eric Rose signed the same agreement.

Defendant National Tractor represents that it has one of the safest records in motor sports and that safety is a high priority. Also, defendant maintains a national and regional structure to implement its technical and safety program. This program is moni-

tored by a national technical committee dedicated to safety. Through defendant's rule book, it warned competitors about risks faced at tractor pull events and took steps to attempt to reduce these risks. Defendant imposed safety rules for competitors to deal with the hazards of fire, catastrophic failure of moving parts or flying objects such as rocks. Helmets, fire suits and extinguishers were mandatory. Safety "blankets" or shrouds were also required for those parts that were subject to catastrophic failure and that created a potential hazard of flying shrapnel. Even with all these safety precautions, the rule book cautions:

It is ultimately the obligation of each participant to ensure that his conduct and equipment comply with all applicable NTPA rules and regulations, as they may be amended from time to time. No express or implied warranty of safety shall result from publication or, compliance with, these Rules. They are intended as a guide for the conduct of the sport and are in no way a guarantee against injury or death to pullers, spectators, or others.

Plaintiff did not expect defendant to issue a rule for every element of the sport and he understood that if defendant did not expressly prohibit something, then defendant allowed it.

Before his accident, plaintiff knew that tractors are capable of rolling over. He had heard about agricultural tractors turning over and he had heard about a rollover involving a 5,500 pound tractor during a pulling competition in Wisconsin. In addition, plaintiff knew that many tractors are equipped with some sort of rollover protection equipment, including a few of the tractors he had driven on his father's farm as well as competition tractors from several of the divisions represented by defendants. With respect to competition models, this equipment usually consisted of a bar that extends from one side of the vehicle to the other over the driver's area or just behind it. This type of rollover protection is different from what is known in the vernacular as "ROPS," a specialized kind of protective system that includes a five-point seat belt harness.

At defendants' joint executive board meeting on October 5, 1990, participants discussed seat belts and roll cages. Minutes from this meeting indicate that

Max Simpson questioned as to what the general feeling would be if seat belts were mandatory.

Mike Johnson stated that it was discussed that if seat belts were made mandatory, then ROPS would be necessary.

The board met again the following day. During this meeting, the representative from the "mini rod" division said that he "would like to see a decision reached regarding the drivers['] cage and 4–point harness requirements." The representative for the four wheel drive division expressed a firmer opinion on this subject, stating that "roll cages need to be required in all Divisions." By contrast, the chair of the super stock division said that his committee did "not feel roll bars are necessary as it would be impossible to police their construction due to the number of different types of vehicles. However, the committee does recommend the use of seat belts, but not mandatory usage." Defendants adopted this recommendation, promulgating a rule that requires installation of seat belts but leaves use of belts up to the discretion of competitors. This rule took effect in 1991. Defendants knew that in the event of a rollover, there is an increased risk that a seatbelt could trap a competitor on the tractor but it also knew that without a seatbelt, the competitor risked being thrown into the path of the tractor or the sled. Defendants recommend seatbelt use because it helps competitors retain control of their tractors.

## OPINION

### A. *Exculpatory Contract*

#### 1. *Overbreadth and ambiguity*

The exculpatory contract signed by plaintiff.is not overbroad or ambiguous. The Wisconsin Supreme Court has held consistently that exculpatory contracts "are not favored by the law because they tend to allow conduct below the acceptable standard of care." *Yauger v. Skiing Enterprises, Inc.,* 206 Wis.2d 76, 81, 557 N.W.2d 60, 62 (1996). For this reason, courts must "closely exam-

ine[ ] whether such agreements violate public policy and construe[ ] them strictly against the party seeking to rely on them." *Id.* (citing *Richards v. Richards,* 181 Wis.2d 1007, 1015, 513 N.W.2d 118, 121 (1994)).

Recently, the Wisconsin Supreme Court has identified two characteristics of an enforceable exculpatory contract: "First, the waiver must clearly, unambiguously, and unmistakably inform the signer of what is being waived. Second, the form, looked at in its entirety, must alert the signer to the nature and significance of what is being waived." *Yauger,* 206 Wis.2d at 84, 557 N.W.2d at 63. In *Yauger,* the father of a child who died in a skiing accident sued the company that ran the ski area. Before the accident, the plaintiff had purchased a season ski pass for his family, listing the names of his wife and two daughters on the application form. By signing the form, the plaintiff had agreed to a number of conditions, including a liability waiver that did not stand out from the rest of the form and did not require a separate signature. The waiver stated, "There are certain inherent risks in skiing and ... we agree to hold Hidden Valley Ski Area/Skiing Enterprises Inc. harmless on account of any injury incurred by me or my family member on the Hidden Valley Ski Area premises." *Id.* at 90, 557 N.W.2d at 66 (appendix). The state supreme court declined to enforce the waiver, concluding that it failed to satisfy either of the operative principles.

Addressing the first principle, the court held that the waiver did not inform the plaintiff clearly and unambiguously' that signing the application meant that he intended "to release Hidden Valley from its own negligence." *Id.* at 84, 557 N.W.2d at 63. Indeed, "negligence" appeared nowhere on the form and the application did not define "inherent risks of skiing," an otherwise ambiguous phrase susceptible to more than one plausible interpretation. *Id.* Moving on to the second principle, the court held that the application form as a whole did not identify its nature and significance clearly and unequivocally. Quite the opposite, the form served as a liability waiver *and* as an application for a season pass, a practice frowned upon by the court in *Richards,* 181 Wis.2d at

1017, 513 N.W.2d at 118 (release not labeled conspicuously or distinguished from other contractual provision). The waiver provision did not stand out in any conspicuous way from the other four paragraphs on the application form and did not require a separate signature. *See Yauger,* 206 Wis.2d at 87, 557 N.W.2d at 64.

In an earlier case, the state supreme court identified additional guidelines relevant to the validity of an exculpatory agreement. In *Richards,* 181 Wis.2d 1007, 513 N.W.2d 118, the wife of a truck driver sued her husband's employers to recover for injuries she sustained while riding as a passenger in her husband's truck. Before embarking on this trip, the wife had signed a "Passenger Authorization" form that contained a liability waiver, among other provisions. The court declared the waiver contrary to public policy for three specific reasons. Although the court acknowledged that a person who signs a written agreement has a duty to read and understand the terms of such an agreement, the authorization form in question could not be understood because it served more than one purpose. *See id.* at 1017, 513 N.W.2d at 122. Second, the waiver was overbroad, purporting to excuse intentional, negligent and reckless conduct, not only by the trucking company but also by unspecified third parties. *See id.* at 1017, 513 N.W.2d at 122. The waiver lacked specificity as well: unlike the provision authorizing the plaintiff to ride in her husband's truck, the release was "not limited to a specified vehicle or to a specified time period." *See id.* Finally, the plaintiff had no meaningful opportunity to bargain over the terms of the waiver. The court reached this conclusion for a combination of reasons: the authorization form was a standardized agreement; the cover letter accompanying the form did not advise the plaintiff that the document requiring her signature was a release or explain its significance; and the release was overbroad. *See id.* at 1020, 513 N.W.2d at 123. Emphasizing the role all of these factors played in depriving the plaintiff of an opportunity to bargain over the release, the court hastened to add that a release is not invalid simply because it is printed on a standardized form. *See id.*

■ The court has issued what appear to be contradictory statements regarding the relative weight it accords to the disfavored characteristics discussed in *Yauger* and *Richards*. For example, in *Yauger*, 206 Wis.2d at 87 n. 1, 557 N.W.2d at 64, the court declined explicitly to examine whether the plaintiff had a meaningful opportunity to bargain over the terms of the waiver agreement because "either of the above principles was sufficient to void this contract." By contrast, in *Richards*, 181 Wis.2d at 1020, 513 N.W.2d at 123, the court emphasized that "none of [the three] factors alone would necessarily have warranted invalidation of the exculpatory contract." This apparent inconsistency is merely a reflection of the court's oft-repeated precept that the validity of an exculpatory contract must be determined on a case-by-case basis. *See, e.g., Yauger*, 206 Wis.2d at 81, 557 N.W.2d at 62 (courts are to examine such agreements closely); *Richards*, 181 Wis.2d at 1015, 513 N.W.2d at 121 (same); *Dobratz v. Thomson*, 161 Wis.2d 502, 514, 468 N.W.2d 654, 658 (1991) (court must examine "particular facts and circumstances" of each case); *Arnold v. Shawano County Agricultural Society*, 111 Wis.2d 203, 210, 330 N.W.2d 773, 777 (1983) (same). Such an individualized approach does not lend itself well to the formulaic application of bright line rules. In some cases, such as *Yauger*, the presence of a single objectionable characteristic will be sufficient to justify invalidating an exculpatory agreement; in other cases, such as Richards, only a combination of different characteristics will do.

Most cases decided before *Yauger* and *Richards* are of marginal persuasive value because these older opinions are controlled by contract law, not public policy. *See, e.g., Arnold*, 111 Wis.2d 203, 330 N.W.2d 773; *Kellar v. Lloyd*, 180 Wis.2d 162, 509 N.W.2d 87 (Ct.App.1993); *Trainor v. Aztalan Cycle Club, Inc.*, 147 Wis.2d 107, 432 N.W.2d 626 (Ct.App.1988). *Trainor* illustrates this principle well. An experienced motorcycle racer sued the sponsors of a motocross competition for injuries he sustained after crashing on a practice lap. Before the accident, the plaintiff had inspected the racecourse and complained to an official about the height of certain jumps. Despite these reservations, the plaintiff signed an exculpatory agreement absolving race sponsors for any claims arising from any accident or occurrence connected with the competition or the condition of the racecourse. *See Trainor*, 147 Wis.2d at 117, 432 N.W.2d at 631. The validity of the exculpatory agreement turned on "whether the accident and Trainor's resulting injuries may be said to constitute the type of occurrences contemplated by the releases," a question the court answered affirmatively. *See id. See also Arnold*, 111 Wis.2d at 211, 330 N.W.2d at 778 (broadly written agreements "bar only those claims that are within the contemplation of the parties when the contact was executed"). This type of contractual inquiry is no longer favored. As explained by the state supreme court in *Yauger*, 206 Wis.2d at 86, 557 N.W.2d at 64, although cases like *Trainor* "resolved the issue [of breadth and ambiguity] on a contractual basis, Richards reached the same result, yet departed from the contractual analysis and rested on public policy. We conclude that public policy is the germane analysis." In practical terms, this means it is irrelevant whether plaintiff knew at the time he signed defendants' exculpatory agreement that tractors are capable of flipping over during pulling events or whether such an occurrence is contemplated by the terms of the release. Instead, the validity of the release is a function of the public policy concerns identified by the court in *Richards* and *Yauger*.

Under this framework, I have no trouble concluding that the exculpatory agreement signed by plaintiff is valid. The agreement informed plaintiff in unambiguous, unmistakable terms that by signing it, he intended to waive all claims against defendants, even for injuries resulting from defendants' own negligence. Plaintiff could have determined this for himself without having to draw any inferences: the word "negligence" appears in several places on the form in conjunction with the waiver language. The agreement satisfies the second principle identified in *Yauger* as well. In a heading spread conspicuously across the top of the page in boldfaced letters, the document informs the reader clearly and unambiguously of its purpose: "RE-

LEASE AND WAIVER OF LIABILITY AND INDEMNITY AGREEMENT." This is the only purpose served by the agreement. It communicated the terms of the waiver and provided a space for signatures. In other respects, the waiver is sufficiently narrow so as not to offend public policy. It is limited to a single event on a single day. It applies only to occurrences within a restricted area that is not accessible to the general public.

The agreement is not perfect but its three most prominent flaws are not numerous or egregious enough to warrant invalidation. For example, the document states the undersigned assume full responsibility for any injury caused by "the negligence of [defendants] or otherwise," but does not define "otherwise." This term could be interpreted reasonably to mean that the waiver purports to encompass *any* conduct, whether negligent, intentional or reckless. Equally plausible, however, is the interpretation that the agreement applies to non-negligent and negligent conduct alike. Regardless, although this term may be ambiguous, the *agreement* itself conforms to the principle set forth in *Yauger* because it unmistakably informs those who sign it that they are accepting the risk of harm resulting from defendants' negligence. Second, defendants could have communicated this fact more forcefully by setting "negligence" in a style of typeface different from the surrounding words. *Cf. Yauger,* 206 Wis.2d at 87 n. 2, 557 N.W.2d at 64 ("Factors that militate in favor of conspicuousness as to print include using a larger print for the negligence waiver, using a different color print, preferably red, and italicizing or boldfacing the waiver"). Nevertheless, the text runs less than half of a page, the font is not minuscule in size and there are no provisions unrelated to waiver that could have distracted readers from the document's sole purpose. Finally, the agreement is printed on a standardized form with room for twenty-six individual signatures. Although these characteristics render the document unamenable to bargaining or negotiation, plaintiff had many opportunities to read the agreement, discuss its terms with defendants and ask questions. *Compare Eder v. Lake Geneva Raceway, Inc.,* 187 Wis.2d 596, 605, 523 N.W.2d 429, 432 (Ct.App.1994) (no meaningful opportunity to negotiate when defendant told plaintiff to sign waiver set in barely legible type as other spectators waited in line behind plaintiff) (citing *Richards,* 181 Wis.2d at 1019, 513 N.W.2d at 123).

## 2. Recklessness

 The Wisconsin Supreme Court has indicated that an exculpatory contract cannot absolve reckless conduct. *See Merten v. Nathan,* 108 Wis.2d 205, 212, 321 N.W.2d 173, 177 (1982) (citing § 195(1), *Restatement (Second) of Contracts* (1979)). In *Merten,* the court quoted but did not apply the section from the Restatement on which this rule is based. For this reason, the parties disagree whether this rule has any persuasive authority. This dispute is irrelevant because plaintiff has failed to adduce any evidence that defendants engaged in reckless conduct.

The evidence relied on by plaintiff amounts to the following three observations: 1) defendants failed to hire an organization capable of developing a roll bar system even though defendants knew that some competitors had experienced rollovers; 2) defendants considered adopting a rule that would have made the use of rollover bars mandatory but rejected this proposal; 3) at least one representative attending defendants' annual board meeting in October 1990 believed that it would be unsafe to require mandatory seat belts use without also requiring the use of roll bar cages. At worst, this evidence indicates that defendants did not pursue safety issues associated with seat belts, roll bars and the risk of rollovers as aggressively as they should have. It does not show that defendants acted "in a manner which [was] so unreasonably dangerous that [they] [knew] or should [have] know[n] that it [was] highly probable that harm [would] result." *Lestina v. West Bend Mutual Insurance Co.,* 176 Wis.2d 901, 907, 501 N.W.2d 28, 31 (1993) (definition of "recklessness") (citing § 500, *Restatement (Second) of Torts* (1965)). Instead, the minutes from defendants' 1990 board meetings reveal that there was a genuine disagreement among representatives of the various divisions within the organizations whether roll cages and seat belt harnesses should be required.

### 3. *Fraud and misrepresentation*

Plaintiff contends that defendants intentionally made false and misleading statements of fact as well as omitted other material facts. According to plaintiff, defendants 1) represented that they placed competitor safety as their number one priority; 2) strongly recommended the use of seatbelts for competitors without disclosing that they knew that such use would place competitors in greater jeopardy in the event of a rollover; and 3) failed to warn competitors that tractors can roll over and that when this happens, a rollover protection structure is necessary for the safety of competitors. Plaintiff maintains that he relied on these misrepresentations and omissions to his detriment. Specifically, he competed in tractor pulls sponsored by defendants and signed release forms absolving defendants of any liability arising from such competitions.

 To establish intentional misrepresentation in Wisconsin, a plaintiff must demonstrate: 1) the defendant made a false representation of fact; 2) the defendant knew such representation was false or made it recklessly without caring whether it was true or false; 3) the defendant did so with intent to defraud and for the purpose of inducing another to act upon the misrepresentation; and 4) the plaintiff relied on the misrepresentation and was induced to act to his or her own detriment. *See Lundin v. Shimanski,* 124 Wis.2d 175, 184, 368 N.W.2d 676, 680–81 (1985). On the merits, none of the statements or omissions allegedly made by defendants rises to the level of misrepresentation. With respect to the first alleged misrepresentation, defendants observe correctly that plaintiff has no personal knowledge whether defendants ever represented that they place competitor safety as their number one priority:

Q. Did anyone at the NTPA or on behalf of the NTPA ever tell you that the NTPA places competitor safety as their number one priority?

A. I may have heard that statement, but from where it came I don't remember.

Q. You don't even know if it is the NTPA or WPI or Joe Blow?

A. No.

Dep. of Randall Rose at 297. The second and third alleged misrepresentations are not based on false statements per se but on the failure of defendants to disclose information about certain safety risks associated with seat belts, roll cages and the risks of a rollover. Failure to disclose information can constitute misrepresentation of fact if there is a duty to disclose such information, as in a fiduciary relationship. *See Killeen v. Parent,* 23 Wis.2d 244, 251, 127 N.W.2d 38, 42 (1964). Assuming such a relationship exists between defendants and its members, plaintiff has produced absolutely no evidence suggesting that defendants withheld the information in question to defraud its members or for the purpose of inducing members to act in reliance on the false assumption that tractor pulling was safer than the rules led competitors to believe.

 Plaintiff asserts that even if his claims of misrepresentation fail on the merits, the exculpatory contract is unenforceable because the safety issues that form the basis of these claims affected his decision whether to sign the contract. Specifically, plaintiff asserts that defendants should have alerted competitors to the safety risk associated with using a seat belt on a tractor not equipped with some sort of rollover protection system; had he known that wearing a seat belt would place him in potentially greater danger in the event of a roll over, he would not have signed the exculpatory contract. Put another way, most people associate seat belts and seat belt use with safety. By requiring competitors to install seat belts on their tractors and strongly recommending that seat belts be used, defendants represented falsely that plaintiff would be safer when wearing his seat belt during competition but, in fact, heeding defendants' recommendation contributed to plaintiff's injuries.

In support of this argument, plaintiff relies primarily on two cases, *Merten,* 108 Wis.2d 205, 321 N.W.2d 173, and *Cadek v. Great Lakes Dragaway, Inc.,* 58 F.3d 1209 (7th Cir.1995). In *Merten,* a novice horseback rider sued her equestrian instructor after sustaining injuries during a lesson. The exculpatory contract signed by the plaintiff

contained a clause indicating that the defendant had no liability insurance; in fact, the defendant had purchased a liability policy covering the type of risks from which the defendant sought release under the contract. The Wisconsin Supreme Court held that even though all of the elements of a claim for misrepresentation could not be established in a case involving an exculpatory contract, enforcement of such contracts would be against public policy "when the bargaining process involves a mistake or deception which is relevant to a reasonable person's decision to execute a release allocating losses." *Merten*, 108 Wis.2d at 215, 321 N.W.2d at 178.

The Court of Appeals for the Seventh Circuit extended this principle one step further in *Cadek*, 58 F.3d at 1210, invalidating an exculpatory contract for a misrepresentation made outside the four corners of the contract. In *Cadek*, the plaintiff sued the owners of a drag racing facility after he raced his "funny car" off the track and into his own van, creating an inferno that destroyed both vehicles. The defendant had parked a fire truck in a conspicuous location alongside the track. As it turned out, however, the truck was just for show: "Great Lakes' fire-extinguishing equipment consisted of a garden hose attached to an exterior spigot." *Cadek*, 58 F.3d at 1210. In light of the tremendous risk of fire associated with drag racing and "[t]he absurdity of operating a drag strip without an operable fire truck ... [,] a person seeing a fire truck parked at a track would inevitably assume that it is operable and there to fight fires." *Id.* at 1211. Because the defendant had misrepresented its firefighting capabilities and because such capabilities are "relevant to a reasonable person's decision whether to run his car at the track and whether to a sign a liability release to do so," the exculpatory contract signed by the plaintiff was unenforceable. *Id.* at 1213 (citing *Merten*, 108 Wis.2d at 214–215, 321 N.W.2d at 178).

Plaintiffs have not shown that defendants engaged in any conduct or made any false statements or omissions about matters relevant to a reasonable person's decision whether to compete in a tractor pull event or sign a liability waiver. I agree that advising competitors to use their seat belts implies that doing so will enhance safety. But by not mandating this practice, defendants acknowledged that there are other risks associated with seat belt use—risks that were known to plaintiff, not hidden or distorted by defendants. Plaintiff's objections notwithstanding, he knew that agricultural and competition tractors are capable of rolling over, that many competitors used rollover bars and that other considerations played into a competitor's decision whether to use a seat belt or install a rollover protection system. For example, wearing a seat belt may place competitors at greater risk in the event of a rollover but it also enhances their ability to maintain control of their tractors and insure that they are not thrown from the cockpit. By contrast, there is no down side to keeping a functioning fire truck on hand at a sporting event known for fire-related mishaps, such as drag racing or tractor pulling. To the extent that defendants failed to disclose facts relevant to the danger of rollovers, the magnitude of this alleged misrepresentation does not compare to parking a non-functioning fire truck at the end of a drag racing track. The notion of a tractor without a five-point harness and a specialized rollover cage could not be characterized as absurd. *Compare Cadek*, 58 F.3d at 1211. If anything, several different schools of thought existed with respect to seat belts and rollover protection systems; practices varied among competitors and members of defendants' board of directors held different opinions regarding these matters. Plaintiff has failed to produce sufficient evidence from which a reasonable finder of fact could conclude that defendants engaged in a form of misrepresentation.

### B. Loss of Consortium and Negligent Infliction of Emotional Distress

Under Wis. Stat. § 803.03(2)(a), an individual's right to recover for loss of consortium is a derivative right. Although § 803.03(2)(a) does not explicitly characterize claims of negligent infliction of emotion distress as derivative rights, plaintiffs Susan and Eric Rose each signed the same exculpatory agreement signed by Randall Rose. Because the claims of plaintiffs Susan, Eric, Nicholas and Emily Rose either derive from the claims of plaintiff Randall Rose or arise from circumstances

covered by the exculpatory contract, these claims are barred for the reasons set forth in section "A" of the opinion.

## ORDER

IT IS ORDERED that:

1. The motion of plaintiffs Randall, Susan, Eric, Nicholas and Emily Rose for partial summary judgment is DENIED;

2. The motion of defendants National Tractor Pullers Association, Inc., World Pulling International, Inc., K & K Insurance and TIG Insurance is GRANTED; and

3. The clerk of the court is directed to enter judgment in favor of defendants and close this case.